Dewey E. COLEMAN,
Petitioner–Appellant,

v.

Jack McCORMICK, Warden, Montana State Prison, and Michael T. Greely, Attorney General for the State of Montana, Respondents–Appellees.

No. 85–4242.

United States Court of Appeals,
Ninth Circuit.

Argued En Banc and
Submitted July 20, 1988.

Decided May 5, 1989.

Timothy K. Ford, Seattle, Wash., Henry T. Greely, Stanford, Cal., for petitioner-appellant.

Patricia J. Schaeffer, Asst. Atty. Gen., State of Mont., Helena, Mont., for respondents-appellees.

Before GOODWIN, Chief Judge, and WALLACE, HUG, TANG, FLETCHER, ALARCON, CANBY, REINHARDT, NOONAN, THOMPSON and TROTT, Circuit Judges.

DAVID R. THOMPSON, Circuit Judge:

Dewey E. Coleman, a Montana state prisoner who has been sentenced to death for the crime of aggravated kidnapping, appeals from the district court's denial of his petition for a writ of habeas corpus under 28 U.S.C. § 2254. We reverse his sentence of death and remand for resentencing.

## I

### FACTS AND PRIOR PROCEEDINGS

The facts upon which Dewey Coleman was found guilty by a jury on November 14, 1976, are fully set forth in Coleman's first appeal to the Montana Supreme Court and need not be repeated here. *State v. Coleman*, 177 Mont. 1, 579 P.2d 732 (1978) (*Coleman I*). The following are the facts relevant to the instant appeal.

Coleman, who is black, and his codefendant, Robert Nank, who is white, were charged with the crimes of deliberate homicide, aggravated kidnapping and sexual intercourse without consent, inflicting bodily injury. Nank entered a plea bargain with the State and escaped the death penalty. The State refused to enter a similar bargain with Coleman for reasons which we need not consider in this opinion. Coleman went to trial and was convicted on all counts. He was sentenced to 100 years for

deliberate homicide and 40 years on the rape charge. He was sentenced to death for aggravated kidnapping under Montana's then existing mandatory death penalty statute.[1] On appeal, the Montana Supreme Court held that the mandatory death penalty statute was unconstitutional. *Coleman I,* 177 Mont. 1, 579 P.2d at 741–42. Coleman's death sentence was vacated and his case was remanded to the trial court for resentencing.[2] Coleman was then resentenced to death in 1978 under a new Montana death penalty statute which had been enacted in 1977. Mont.Code Ann. §§ 95–2206.6 to 95–2206.15 (now codified at Mont.Code Ann. §§ 46–18–301 to 46–18–310; hereinafter cited in precodification version and reproduced at Appendix). Coleman's sentence was automatically reviewed by the Montana Supreme Court. Mont.Code Ann. §§ 95–2206.12 to 95–2206.15. The court upheld his convictions and sentences. *State v. Coleman,* 185 Mont. 299, 605 P.2d 1000 (1979) (*Coleman II*), *cert. denied,* 446 U.S. 970, 100 S.Ct. 2952, 64 L.Ed.2d 831 (1980); *Coleman v. Sentencing Review Division of Supreme Court of Montana,* 449 U.S. 893, 101 S.Ct. 255, 66 L.Ed.2d 121 (1980) (vacating stay of execution of death sentence and denying *certiorari*).

Thereafter, Coleman filed a petition with the state court for post-conviction relief. His judgment and sentence were once again reviewed and affirmed by the Montana Supreme Court. *Coleman v. State,* 633 P.2d 624 (Mont.1981), *cert. denied,* 455 U.S. 983, 102 S.Ct. 1492, 71 L.Ed.2d 693 (1982) (*Coleman III*).

Coleman then filed a petition for a writ of habeas corpus under 28 U.S.C. § 2254 in the United States District Court for the District of Montana. This proceeding was stayed to enable Coleman to exhaust his state remedy for review of his convictions and death sentence in light of a recent discovery by his then counsel of a transcript of a pretrial hearing. The transcript revealed that during the hearing Coleman's previous counsel had made statements to the court which implied that Coleman had admitted participating in the murder after being given sodium amytal. The judge who had presided at this pretrial hearing was the same judge who later sentenced Coleman to death. Coleman's convictions and death sentence were once again reviewed and affirmed by the Montana Supreme Court. *Coleman v. Risley,* 203 Mont. 237, 663 P.2d 1154 (1983) (*Coleman IV*).

Coleman then returned to the district court. He filed a motion for an evidentiary hearing on his habeas corpus petition. He sought a hearing on twelve of thirty-seven issues raised in his petition, and filed a motion for summary judgment on the remaining issues. The State also filed a motion for summary judgment. The district court denied Coleman's request for an evidentiary hearing, denied his motion for summary judgment, and granted summary judgment in favor of the State.

## II

## THE CONVICTION

### Jury Selection

Coleman challenges his convictions on the ground that his sixth amendment right to an impartial jury was violated. He con-

---

1. The statute provided that "[a] court shall impose the sentence of death following conviction of aggravated kidnapping if it finds that the victim is dead as a result of the criminal conduct." Rev.Code Mont. § 94–5–304 (1947) (repealed 1977).

2. Coleman's conviction on all three counts, and sentence for deliberate homicide, were affirmed. His death sentence and his sentence for sexual intercourse without consent, inflicting bodily injury were vacated. The Montana Supreme Court concluded there was insufficient evidence to show Coleman had inflicted bodily injury upon the victim in the course of committing sexual intercourse because she was murdered sometime after the rape incident. *Coleman I,* 177 Mont. 1, 579 P.2d at 742–43. On remand, Coleman was resentenced to death and was sentenced to 20 years for the crime of sexual intercourse without consent, the latter sentence to run consecutively to his sentence of 100 years for deliberate homicide. *Coleman II,* 185 Mont. 299, 605 P.2d 1000, 1007 (1979).

tends his jury panel was selected in an impermissibly discretionary manner.[3]

Coleman's first jury panel was dismissed by the court three days before trial in response to a challenge by Coleman. A second panel was drawn. Each name on the jury list was assigned a number, the numbers were placed in a box, and 200 were drawn. The court then directed the court clerk to obtain a panel of sixty jurors by telephoning persons whose names were drawn from the box to see if they would be available to serve on a jury within the next three days. Sixty-one of the prospective jurors indicated they would be available and sixty appeared for Coleman's trial. *Coleman I,* 177 Mont. 1, 579 P.2d at 746–47. It was from this panel that Coleman's trial jury was chosen.

In arguing that the sixty persons making up his jury panel were impermissibly selected, Coleman alleges that potential jurors were asked whether they could appear for his trial and were allowed to excuse themselves on grounds not revealed to him. He further alleges that the system by which his panel of sixty potential jurors was selected had the disproportionate effect of placing mainly white, affluent residents from the west side of Billings, Montana on the panel. He argues that this system was controlled, not random, and

resembled the so-called "key man" system of jury selection.[4]

Coleman contends that he is entitled to an evidentiary hearing on this issue. To obtain an evidentiary hearing, Coleman "must show that (1) he has alleged facts which, if proved, would entitle him to relief, and (2) an evidentiary hearing is required to establish the truth of his allegations." *Harris v. Pulley,* 692 F.2d 1189, 1197 (9th Cir.1982), *rev'd on other grounds,* 465 U.S. 37, 104 S.Ct. 871, 79 L.Ed.2d 29 (1984); *see also Bashor v. Risley,* 730 F.2d 1228, 1233 (9th Cir.), *cert. denied,* 469 U.S. 838, 105 S.Ct. 137, 83 L.Ed.2d 77 (1984).

### A. *Lack of Showing of Distinctive Group*

■■■■ Trial by a jury of one's peers contemplates that an impartial jury will be drawn from a fair cross-section of the community. *Thiel v. Southern Pacific Co.,* 328 U.S. 217, 220, 66 S.Ct. 984, 985, 90 L.Ed. 1181 (1946). The sixth amendment does not guarantee a randomly selected jury, *United States v. Wellington,* 754 F.2d 1457, 1468 (9th Cir.), *cert. denied sub nom. Utz v. United States,* 474 U.S. 1032, 106 S.Ct. 592, 593, 88 L.Ed.2d 573 (1985), nor does it require that the jury contain representatives from every group in the community. *Lockhart v. McCree,* 476 U.S. 162, 173–75, 106 S.Ct. 1758, 1759, 90 L.Ed.

---

**3.** In his dissent, Judge Alarcon contends Coleman also seeks reversal of his convictions on the ground that he was denied effective assistance of counsel, because his first attorney told the court at a pretrial hearing that Coleman had taken a sodium amytal test and had admitted participating in the crimes with which he was charged. We disagree with this characterization of Coleman's appeal. Coleman's attack regarding the sodium amytal procedure and his attorney's revelation of its results is not directed to his convictions, but to his sentence. Coleman's argument is that he was sentenced to death without due process because the results of the sodium amytal test were revealed to the judge who later became the judge who sentenced him to death. Appellant's Brief, pp. 22–24. No argument is made that this incident had any effect on Coleman's convictions. Because we reverse Coleman's death sentence on other grounds, we do not reach his sodium amytal/ineffective assistance of counsel argument.

The dissent also contends Coleman has raised an issue on appeal concerning the sufficiency of

the evidence on which he was convicted. We disagree. Coleman's only argument about the evidence presented at his trial concerns the effect such evidence was given when he was sentenced to death. *See* Appellant's Brief, p. 48.

**4.** Coleman's argument that his jury panel was selected using the key man system is without merit. The key man system of jury selection involves the selection of particular persons to make up a pool from which a jury is then chosen at random. It is not unconstitutional on its face. *Castaneda v. Partida,* 430 U.S. 482, 497, 97 S.Ct. 1272, 1281, 51 L.Ed.2d 498 (1977); *United States v. Nelson,* 718 F.2d 315, 319 (9th Cir. 1983). Here there is nothing to suggest the jury panel was chosen using the key man system. The initial 200 jurors were selected at random. *Cf. Castaneda,* 430 U.S. at 497, 97 S.Ct. at 1281. The panel of sixty potential jurors were in essence volunteers, a fact which standing alone does not render the composition of a panel unconstitutional. *Nelson,* 718 F.2d at 319.

2d 137 (1986); *Thiel,* 328 U.S. at 220, 66 S.Ct. at 985. A fair cross-section challenge to the constitutionality of the jury venire requires a showing:

(1) [T]hat the group alleged to be excluded is a 'distinctive' group in the community;

(2) [T]hat the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and

(3) [T]hat this underrepresentation is due to systematic exclusion of the group in the jury-selection process.

*United States v. Miller,* 771 F.2d 1219, 1228 (9th Cir.1985) (quoting *Duren v. Missouri,* 439 U.S. 357, 364, 99 S.Ct. 664, 668, 58 L.Ed.2d 579 (1979).

Coleman contends that as a result of the jury selection process, persons from the lower socioeconomic areas of Billings were excluded from his panel of prospective jurors. He has not alleged any facts, however, from which it could be concluded that persons from the lower socioeconomic areas of Billings formed a distinctive group in the community, or that if such a group existed it consisted of a sufficient number of persons so that its systematic exclusion from jury panels would support a fair cross-section challenge under the sixth amendment. *Duren,* 439 U.S. at 364, 99 S.Ct. at 668; *see Taylor v. Louisiana,* 419 U.S. 522, 531, 95 S.Ct. 692, 698, 42 L.Ed.2d 690 (1975); *United States v. Kleifgen,* 557 F.2d 1293 (9th Cir.1977); *United States v. Potter,* 552 F.2d 901, 904–05 (9th Cir.1977). Having failed to demonstrate the existence of a "distinctive" group, Coleman's claims that such a group was underrepresented in jury venires or was systematically excluded in the jury selection process also fail.

**B.** *Method of Selection of Available Jurors*

■ Coleman challenges the clerk's dismissal of 139 of the 200 potential jurors drawn from the box. There is nothing in the record, however, to suggest that the jurors who were excused by the clerk were excused for any reason other than their inability to serve in a jury trial which was to commence in three days. *Coleman I,* 177 Mont. 1, 579 P.2d at 746. Coleman does not contend, nor does the record reveal, that the 200 names from which the 60 members of his panel were chosen do not represent a fair cross-section of the community.

The method of jury selection in Coleman's case was similar to that which occurred in *United States v. Anderson,* 509 F.2d 312 (D.C.Cir.1974), *cert. denied,* 420 U.S. 991, 95 S.Ct. 1427, 43 L.Ed.2d 672 (1975). There, 200 to 300 jurors were selected for jury service. The defendant did not contend that these jurors were not representative of a fair cross-section of the community. The jurors were told that the trial would be lengthy and the court asked how many jurors would be able to serve. Sixty-eight jurors indicated they would be available, and sixty of these were selected for the panel. *Id.* at 321. On appeal the defendant contended the jurors consisted of volunteers and thus did not represent a cross-section of the community. *Id.* In rejecting this contention, the court concluded that the underlying complement of jurors represented a fair cross-section of the community and "[n]either the panel nor the trial jury became any the less so by reason of the technique the judge employed." *Id.* at 322. The court went on to state, "the judge did not exclude anyone or any cognizable group. The sole criterion he employed was ability to serve longer; the panel from which the jury was drawn was distinguished only by that quality." *Id.* (footnote omitted); *see also United States v. Branscome,* 682 F.2d 484, 485 (4th Cir. 1982) (grand jury); *United States v. Kennedy,* 548 F.2d 608, 611 (5th Cir.), *reh'g denied,* 554 F.2d 476 (5th Cir.), *cert. denied,* 434 U.S. 865, 98 S.Ct. 199, 54 L.Ed.2d 140 (1977).

Coleman did not present any affidavit or other evidence to suggest jurors were dismissed for any reason other than unavailability. His challenge to the sixty-person jury panel "consists exclusively of counsel's statements, unsworn and unsupported by any proof or offer of proof." *Frazier v.*

*United States,* 335 U.S. 497, 503, 69 S.Ct. 201, 205, 93 L.Ed. 187 (1948). These "conclusory allegations do not provide a sufficient basis to obtain a hearing in federal court." *Harris,* 692 F.2d at 1199.

Finally, Coleman argues in his reply brief that the trial judge improperly disqualified two jurors because of their opposition to the death penalty. He has failed to present any showing that would justify an evidentiary hearing on this issue. *Maggio v. Williams,* 464 U.S. 46, 50, 104 S.Ct. 311, 313, 78 L.Ed.2d 43 (1983) (per curiam).

We conclude that Coleman's sixth amendment right to an impartial jury was not violated.

### III

### THE SENTENCE

Coleman challenges his sentence of death on the grounds that (a) his resentencing under the 1977 death penalty statute violated the *ex post facto* clause of the Constitution; (b) Montana's death penalty statute unconstitutionally required him to bear the burden of proof of mitigating factors; (c) his trial and death sentence, which occurred because the State refused to make the same plea bargain with him that it made with Nank, were the result of racial discrimination; and (d) he was denied due process of law when he was sentenced to death under a statute not in effect at the time of his trial. Because we reverse Coleman's death sentence on the ground that he was denied due process in the imposition of that sentence, we do not reach Coleman's other arguments.[5]

Coleman was convicted and first sentenced to death in 1975 under a mandatory death penalty statute subsequently held to be unconstitutional in 1978 by the Montana

Supreme Court in *Coleman I,* 177 Mont. 1, 579 P.2d at 741–42.[6] In 1977, the Montana legislature repealed the death penalty statute under which Coleman had originally been tried and sentenced and passed a new death penalty statute, the constitutionality of which Montana's supreme court upheld in *State v. McKenzie,* 177 Mont. 280, 581 P.2d 1205, 1228–29 (Mont.1978), *vacated on other grounds,* 443 U.S. 903, 99 S.Ct. 3094, 61 L.Ed.2d 871 (1979). Coleman was resentenced to death in 1978 under this new statute.

Pursuant to section 95–2206.6 of the 1977 statute (*see* Appendix), the judge who presided over the trial is also required to conduct a sentencing hearing and determine whether, under sections 95–2206.8 or 95–2206.9 of the statute, there exist any aggravating or mitigating circumstances for purposes of determining the sentence to be imposed. Under this statutory scheme, the trial court must impose a sentence of death if it finds the existence of at least one of the enumerated aggravating circumstances, "and finds that there are no mitigating circumstances sufficiently substantial to call for leniency." Mont.Code Ann. § 95–2206.10. The aggravating circumstance relevant to this case is subsection (7) of section 95–2206.8: "[t]he offense was aggravated kidnapping which resulted in the death of the victim." The sentencing judge concluded that there were no mitigating circumstances sufficiently substantial to call for leniency, and sentenced Coleman to death. Coleman contends that, in light of the procedural framework of the revised statute, the imposition of his death sentence under it violated the due process clause of the Constitution. We agree.

■ We begin our analysis of this issue by noting that the Supreme Court has not

---

**5.** Both parties agree, and it is clear from the record, that Coleman has exhausted his state remedies on this issue by arguing before the Montana courts that the application of Montana's 1977 death penalty law to this case violated due process. The issue is thus properly before us on appeal.

**6.** In *Coleman I,* the Montana Supreme Court held that Montana's mandatory death penalty statute was unconstitutional because "[t]here is

no provision for the trial court to consider any mitigating circumstances." *Coleman I,* 177 Mont. 1, 579 P.2d at 742. The court found the requirements of the statute were inconsistent with the Supreme Court's holdings in *Woodson v. North Carolina,* 428 U.S. 280, 96 S.Ct. 2978, 49 L.Ed.2d 944 (1976), *Coker v. Georgia,* 433 U.S. 584, 97 S.Ct. 2861, 53 L.Ed.2d 982 (1977) and *Roberts v. Louisiana,* 431 U.S. 633, 97 S.Ct. 1993, 52 L.Ed.2d 637 (1977).

to date addressed a *due process* challenge to the retroactive application of a sentencing statute that resulted in the death sentence. The retroactive application of statutes has typically been challenged as violative of the *ex post facto* clause, U.S. Const., art. I, § 10. *See, e.g., Dobbert v. Florida,* 432 U.S. 282, 97 S.Ct. 2290, 53 L.Ed.2d 344 (1977); *Thompson v. Missouri,* 171 U.S. 380, 18 S.Ct. 922, 43 L.Ed. 204 (1898); *Knapp v. Cardwell,* 667 F.2d 1253 (9th Cir.), *cert. denied,* 459 U.S. 1055, 103 S.Ct. 473, 74 L.Ed.2d 621 (1982). In *Dobbert,* the Supreme Court upheld the retroactive application of Florida's capital sentencing law under the *ex post facto* clause, but did not address the due process issue.[7] The Court in *Dobbert* reiterated the "well settled" principle that the *ex post facto* clause does not " 'limit the legislative control of remedies and modes of procedure which do not affect matters of substance.' " *Dobbert,* 432 U.S. at 293, 97 S.Ct. at 2298 (quoting *Beazell v. Ohio,* 269 U.S. 167, 171, 46 S.Ct. 68, 69, 70 L.Ed. 216 (1925)). As a corollary to this principle, the Court noted that "[e]ven though it may work to the disadvantage of a defendant, a procedural change is not *ex post facto.*" *Id.* By contrast, the procedural component of the due process clause protects individuals' rights to fundamentally fair procedures before they are deprived of their liberty rights. *See Joint Anti–Fascist Refugee Committee v. McGrath,* 341 U.S. 123, 161, 71 S.Ct. 624, 643, 95 L.Ed. 817 (1951) (Frankfurter, J., concurring). Especially in the capital sentencing arena, this court has an obligation to scrutinize closely the sentencing procedures against "fundamental principles of procedural fairness." *See Presnell v. Georgia,* 439 U.S. 14, 16, 99 S.Ct. 235, 236, 58 L.Ed.2d 207 (1978);

*Gardner v. Florida,* 430 U.S. 349, 357, 97 S.Ct. 1197, 1204, 51 L.Ed.2d 393 (1977).

When one compares the sentencing law in effect at the time Coleman was tried and sentenced with the law under which he was resentenced, it is apparent that application of the procedural aspects of the new statute to Coleman's case violated due process. Under the Montana death penalty statute which was in effect when Coleman was originally tried and sentenced, once a defendant was convicted of the crime of aggravated kidnapping, a sentence of death was mandatory. Rev.Code Mont. § 94–5–304 (1947) (repealed 1977). Montana law did not permit the sentencer to consider mitigating circumstances. Therefore, the only factor in Coleman's trial impacting whether he would live or die was whether or not he was convicted of aggravated kidnapping.

The new law under which Coleman was resentenced contains procedures which mandate what is tantamount to a second trial. This "second trial" is the sentencing hearing. The judge who presides over the guilt phase of the trial is the same judge who presides over the sentencing hearing. This judge decides whether a defendant lives or dies. Mont.Code Ann. § 95–2206.6. Evidence, regardless of its content, which came in during the guilt phase may be considered by the sentencing judge during the sentencing hearing. *Id.* § 95–2206.7.

As Coleman's counsel prepared for trial, during pretrial proceedings, and during trial, he had no idea that the decisions he was making would have any effect on a post-trial decision by the trial judge whether Coleman lived or died. Coleman's counsel could not have known that a new law would be enacted under which the same judge who

---

7. The Court in *Dobbert* upheld the imposition of a death sentence on a defendant who was tried and sentenced under a valid capital punishment statute even though the statute was not in effect at the time the crime was committed. The amendment to the statute came after commission of the crime but before trial. By contrast, in the present case Coleman was sentenced under an unconstitutional capital punishment statute. At least two courts have concluded that this factual distinction from *Dobbert* is decisive and have declined to resentence under new stat-

utes defendants who were tried, convicted and sentenced under unconstitutionally defective statutes. *See Meller v. State,* 94 Nev. 408, 409 n. 3, 581 P.2d 3, 4 n. 3 (1978) (per curiam); *State v. Rogers,* 270 S.C. 285, 291, 242 S.E.2d 215, 217–18 (1978); *cf., State v. Lindquist,* 99 Idaho 766, 589 P.2d 101, 105 (1979) (acknowledging factual distinction with *Dobbert* but resting decision on other grounds). Because we decide this case on due process grounds, rather than under the *ex post facto* clause as in *Dobbert,* we do not reach Coleman's *ex post facto* argument.

presided at Coleman's trial would preside at a subsequent sentencing hearing and would consider, among other things, Coleman's prior record of criminal activity, be it good or bad. He only knew that if Coleman were convicted of aggravated kidnapping, he would die. Thus, it made no difference during Coleman's trial whether evidence of prior criminal activity came in. Indeed, Coleman's counsel presented just such evidence on cross-examination of Coleman's codefendant, Robert Nank. He elicited testimony from Nank (which Coleman denied) that Nank and Coleman had committed a robbery on the day of the murder. Coleman's counsel brought out this testimony in an apparent attempt to discredit Nank. But would he have done so if he had known this testimony would provide evidence to negate mitigation, a circumstance which could mean the death of his client?[8] Not knowing that there would be any post-conviction death penalty hearing, how could Coleman's counsel have gauged the probative value of this evidence in deciding whether the chance of an acquittal was so enhanced by its admission that it was worth the risk to bring it before the jury, notwithstanding the consequences it might have at a later death penalty hearing before the trial judge? Would Coleman's counsel have made the tactical decision he made? We don't know. Coleman's counsel never had the opportunity to make this choice. The choice was made for him by application of the new death penalty statute at his sentencing hearing. Coleman's trial judge became his sentencer and all of the trial evidence relevant to the newly adopted categories of aggravating and mitigating circumstances became crucial to the sentencer's decision whether Coleman lived or died.

Coleman's testimony, to which the sentencing judge referred in imposing his sentence, also impacted the sentencing judge's imposition of the death penalty. Apparently Coleman's trial counsel believed that it was necessary for Coleman to testify in order to avoid a conviction. But would he have made this same choice if he had known Coleman's testimony, not only its content but Coleman's demeanor on the stand and how he held up under cross-examination, would be considered at a post-conviction sentencing hearing on the question whether Coleman lived or died? Again, this decision, whether or not to testify in one's own defense, can only be made rationally if the consequences of such a course of action are known. Here they were not.

The new death penalty statute also impacted the delicate decision of whether to challenge the trial judge. At the time Coleman was tried, Montana permitted a party to a criminal case to remove the assigned judge without cause. Rev.Code Mont. § 95–1709 (1949) (amended and recodified at Mont.Code Ann. § 3–1–804). Indeed, the prosecution removed the first judge assigned to Coleman's case because of a belief that he was prejudiced against the prosecution's position. Coleman might have elected to remove the next judge who was assigned the case. He did not. But he did not know that under the new statute his trial judge would become his sentencer, if he were convicted. It is one thing to accept a judge for the purpose of conducting a fair trial, and quite another to accept that judge not only to conduct the trial but to become the sole decisionmaker on the question of life or death. Coleman had no reason to consider these factors under the old law. They became relevant only under the new law. Realistically, therefore, Coleman never had the opportunity to make an informed decision whether to challenge the trial judge, and thereby prevent him from becoming the sentencer. That scenario simply did not present itself under the old law. And yet, Coleman had to bear the consequence of sentencing under the new law as if such a decision had been made.

---

**8.** When Coleman was resentenced under the new death penalty statute, the sentencing judge stated that he was relying on the burglary to which Nank testified, and which Coleman denied, to deny Coleman any statutory credit in mitigation for not having any prior history of criminal activity. *See* Mont.Code Ann. § 95–2206.9(1). Deprivation of this mitigating factor was critical, because it eliminated a circumstance that might have overcome the aggravating factor and allowed Coleman to avoid the death penalty.

The finality and severity of a death sentence makes it qualitatively different from all other forms of punishment. *See, e.g., Lockett v. Ohio,* 438 U.S. 586, 605, 98 S.Ct. 2954, 2965, 57 L.Ed.2d 973 (1978) (plurality opinion). The Supreme Court has stressed the great need for reliability in capital cases requiring that "capital proceedings be policed at all stages by an especially vigilant concern for procedural fairness and for the accuracy of factfinding." *Strickland v. Washington,* 466 U.S. 668, 704, 104 S.Ct. 2052, 2073, 80 L.Ed.2d 674 (1984) (Brennan, J., concurring in part and dissenting in part); *see also California v. Ramos,* 463 U.S. 992, 998–99, 103 S.Ct. 3446, 3451–52, 77 L.Ed.2d 1171 (1983) ("the qualitative difference of death from all other punishments requires a correspondingly greater degree of scrutiny of the capital sentencing determination") (footnote omitted).

"The defendant has a legitimate interest in the character of the procedure which leads to the imposition of [the death] sentence...." *Gardner,* 430 U.S. at 358, 97 S.Ct. at 1204. When human life is at stake, the need to ensure that punishment is meted out fairly and in a noncapricious manner is preeminent. *Dobbert,* 432 U.S. at 309, 97 S.Ct. at 2306 (Stevens, J., dissenting). The defendant is due at least that amount of process which enables him to put on a defense during trial knowing what effect such a strategy will have on the subsequent capital sentencing, the results of which may be equally if not more critical to the defendant than the conviction itself.

Coleman was given no notice whatsoever of the life and death consequences of his actions in defending himself against the State's prosecution before and during trial. A defendant's right to notice and to fair warning of the conduct that impacts upon his liberty is a basic principle long recognized by the Supreme Court. *Cf. Bouie v. City of Columbia,* 378 U.S. 347, 350–51, 84 S.Ct. 1697, 1700–01, 12 L.Ed.2d 894 (1964); *In re Oliver,* 333 U.S. 257, 273, 68 S.Ct. 499, 507, 92 L.Ed. 682 (1948). Because Coleman had no reason to suspect that his decisions at trial would come back to haunt him at a sentencing hearing, we must conclude that he was denied due process when he was resentenced to death under Montana's revised death penalty statute.

■ The State argues that even if Coleman's due process rights were violated, the error was harmless. Ever since *Chapman v. California,* 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967), it has been the general rule that "an otherwise valid conviction should not be set aside if the reviewing court may confidently say, on the whole record, that the constitutional error was harmless beyond a reasonable doubt." *Delaware v. Van Arsdall,* 475 U.S. 673, 681, 106 S.Ct. 1431, 1436, 89 L.Ed.2d 674 (1986). The harmless error rule "recognizes ... that the central purpose of a criminal trial is to decide the factual question of the defendant's guilt or innocence ... and promotes public respect for the criminal process by focusing on the underlying fairness of the trial rather than on the virtually inevitable presence of immaterial error." *Id.* (citations omitted). The Supreme Court has not exempted capital cases from harmless error analysis. *See, e.g., Satterwhite v. Texas,* 486 U.S. 249, 108 S.Ct. 1792, 100 L.Ed.2d 284 (1988) (applying harmless error analysis); *Gilbert v. California,* 388 U.S. 263, 87 S.Ct. 1951, 18 L.Ed.2d 1178 (1967) (same); *see also Hitchcock v. Dugger,* 481 U.S. 393, 107 S.Ct. 1821, 1824, 95 L.Ed.2d 347 (1987) (reversing death sentence because there was constitutional error and state did not show that error was harmless).

*Chapman* and its progeny have recognized, however, that the harmless error rule has exceptions. As the Court in *Chapman* observed, "there are some constitutional rights so basic to a fair trial that their infraction can never be treated as harmless error." 386 U.S. at 23, 87 S.Ct. at 827; *see id.* at 23 n. 8, 87 S.Ct. at 828 n. 8, citing *Gideon v. Wainwright,* 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed.2d 799 (1963) (complete denial of right to counsel); *Payne v. Arkansas,* 356 U.S. 560, 78 S.Ct. 844, 2 L.Ed.2d 975 (1958) (introduction of coerced confession); *Tumey v. Ohio,* 273 U.S. 510, 47 S.Ct. 437, 71 L.Ed. 749 (1927) (adjudication by biased judge). Since

*Chapman,* the Court has added to the list of constitutional violations which merit *per se* reversal. *See, e.g., Waller v. Georgia,* 467 U.S. 39, 49 & n. 9, 104 S.Ct. 2210, 2217 & n. 9, 81 L.Ed.2d 31 (1984) (public trial); *Holloway v. Arkansas,* 435 U.S. 475, 98 S.Ct. 1173, 55 L.Ed.2d 426 (1978) (conflict of interest in representation throughout entire proceeding); *Faretta v. California,* 422 U.S. 806, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975) (self-representation); *Price v. Georgia,* 398 U.S. 323, 90 S.Ct. 1757, 26 L.Ed.2d 300 (1970) (double jeopardy). In adding to this list, however, the Court has emphasized that the "errors to which *Chapman* does not apply ... are the exception and not the rule." *Rose v. Clark,* 478 U.S. 570, 578, 106 S.Ct. 3101, 3106, 92 L.Ed.2d 460 (1986).

This case does not involve one of the categories listed above which the Supreme Court has determined to be exempt from *Chapman* harmless error analysis. In this case, the critical factor rendering violations of these rights inappropriate for harmless error analysis is the reviewing court's inability to determine whether such violations were in fact harmless beyond a reasonable doubt. *See, e.g., Satterwhite,* 108 S.Ct. at 1798 (harmless error rule applies since "reviewing court *can make an intelligent judgment* about whether the erroneous admission of psychiatric testimony might have affected a capital sentencing jury") (emphasis added). Errors that either "abort[ ] the basic trial process ... or den[y] it altogether," *Rose,* 478 U.S. at 578 n. 6, 106 S.Ct. at 3106 n. 6, have an effect on the composition of the record so pervasive that it cannot be determined by the reviewing court. *See also Satterwhite,* 108 S.Ct. at 1797 (errors that "pervade the entire proceeding" and whose scope "cannot be discerned from the record" require *per se* reversal); *Van Arsdall,* 475 U.S. at 681, 106 S.Ct. at 1436 (suggesting that errors having a pervasive effect on the factfinding *process* are not susceptible to harmless error analysis). To apply harmless error analysis under such circumstances would require the reviewing court to engage in an inquiry that was "purely speculative." *Satterwhite,* 108 S.Ct. at 1797.

Applying the foregoing principles to this case, we hold that the due process violation here is not subject to harmless error analysis. Coleman was sentenced to death under a statute not in effect at the time of his trial. The new statute added a sentencing "trial" at which the sentencing judge could consider any evidence that came in during the guilt phase. By contrast, the old statute required the death penalty once a defendant was convicted of aggravated kidnapping. Coleman's counsel made countless tactical decisions at trial aimed solely at obtaining Coleman's acquittal, without even a hint that evidence in the record would be considered as either mitigating or aggravating factors. This due process violation had a pervasive effect on the composition of the trial record. As we have already observed, Coleman's counsel might not have called his client to testify under the new statute. He might not have brought in evidence of Coleman's prior criminal activity in his cross-examination of Nank. He might have challenged the trial judge. It would be fruitless in this case to require trial counsel to provide a record of how he or she would have handled the case differently. The error is such that no additional evidence is needed to demonstrate that the error "pervade[s] the entire proceeding." *See id.; see also Raley v. Ohio,* 360 U.S. 423, 439, 79 S.Ct. 1257, 1267, 3 L.Ed.2d 1344 (1959) (it is impermissible in a criminal case to excuse due process violations by assuming that the defense would have acted as it did had no violation occurred). We will not affirm Coleman's death sentence by speculating that his defense counsel might have made the same pretrial and trial decisions regardless of the sentencing scheme. *See Givens v. Housewright,* 786 F.2d 1378, 1381 (9th Cir. 1986).

We, therefore, REVERSE the district court and REMAND with instructions to determine a reasonable time for the State to vacate Coleman's sentence of death on the aggravated kidnapping count. If within such time the State does not vacate Coleman's death sentence, the district court is instructed to grant the writ of habeas

corpus as to the aggravated kidnapping count.[9] The opinion of the three-judge panel in this case, reported at 839 F.2d 434 (9th Cir.1988), is withdrawn.

## APPENDIX

95–2206.6. Sentence of death—hearing on imposition of death penalty. When a defendant is found guilty of or pleads guilty to an offense for which the sentence of death may be imposed, the judge who presided at the trial or before whom the guilty plea was entered shall conduct a separate sentencing hearing to determine the existence or nonexistence of the circumstances set forth in 95–2206.8 and 95–2206.9 for the purpose of determining the sentence to be imposed. The hearing shall be conducted before the court alone.

95–2206.7. Sentencing hearing—evidence that may be received. In the sentencing hearing, evidence may be presented as to any matter the court considers relevant to the sentence, including but not limited to the nature and circumstances of the crime, the defendant's character, background, history, mental and physical condition, and any other facts in aggravation or mitigation of the penalty. Any evidence the court considers to have probative force may be received regardless of its admissibility under the rules governing admission of evidence at criminal trials. Evidence admitted at the trial relating to such aggravating or mitigating circumstances shall be considered without reintroducing it at the sentencing proceeding. The state and the defendant or his counsel shall be permitted to present argument for or against sentence of death.

95–2206.8. Aggravating circumstances. Aggravating circumstances are any of the following:

(1) The offense was deliberate homicide and was committed by a person serving a

---

**9.** Coleman's contention that he was prosecuted, and sentenced to death, because of race discrimination when the state plea bargained with Nank, a white man, but refused to enter into a plea bargain with Coleman, who is black, does not impact his conviction of deliberate homicide. He would have been convicted upon his offer to plead guilty to this crime in any event. Nor does it have any disadvantageous impact on Coleman by reason of his conviction of sexual intercourse without consent, a crime different from the crime of solicitation to commit sexual intercourse to which Nank pleaded guilty. Nank's sentence for solicitation to commit sexual intercourse (Nank being the "solicitor" and Coleman the "solicitee") was 40 years. Coleman's sentence for sexual intercourse without consent, the crime he was eventually left convicted of following his first appeal, was 20 years. Both sentences were the maximums for the respective crimes. The disparity in the sentences occurred when the Montana Supreme Court struck the bodily injury element from Coleman's conviction of sexual intercourse without consent.

Coleman's racial discrimination claim, however, does impact his conviction of aggravated kidnapping, a crime to which his plea offer would not have applied. Upon resentencing, the state court will have to determine what sentence to impose on Coleman and how to treat his conviction of aggravated kidnapping in view of our reversal of his death sentence. Until Coleman is resentenced, we cannot evaluate the merits of his claim of racial discrimination based upon the state's refusal to plea bargain with him as it did with Nank.

In his dissent, Judge Alarcon states that he "do[es] not understand the majority's reluctance to face up to Mr. Coleman's constitutional attack on the judgment of *conviction* for aggravated kidnapping, deliberate homicide, and forcible rape in the appeal presently before this court. If Mr. Coleman has stated sufficient facts to show that these convictions were obtained in violation of his constitutional rights, he is entitled to an evidentiary hearing in the district court now." Alarcon, J., dissenting p. 1308. We disagree. There is a strong practical possibility that today's decision upholding one of Coleman's principal constitutional arguments will serve ultimately to make it unnecessary for us to consider Coleman's remaining claims. While this may depend in part on Coleman's and Montana's actions following remand, it would not be appropriate for us to presume that those actions will fail to eliminate any need for this court to address further constitutional arguments.

We express no opinion as to whether Montana would be precluded from again seeking the death penalty in the event Coleman obtains a new trial. *Compare Bullington v. Missouri,* 451 U.S. 430, 101 S.Ct. 1852, 68 L.Ed.2d 270 (1981), and *Fitzpatrick v. McCormick,* 869 F.2d 1247 (9th Cir.1989), *with United States v. DiFrancesco,* 449 U.S. 117, 101 S.Ct. 426, 66 L.Ed.2d 328 (1980); *North Carolina v. Pearce,* 395 U.S. 711, 89 S.Ct. 2072, 23 L.Ed.2d 656 (1969); *Stroud v. United States,* 251 U.S. 15, 40 S.Ct. 50, 64 L.Ed. 103 (1919); and *United States v. Andersson,* 813 F.2d 1450 (9th Cir.1987).

sentence of imprisonment in the state prison.

(2) The offense was deliberate homicide and was committed by a defendant who had been previously convicted of another deliberate homicide.

(3) The offense was deliberate homicide and was committed by means of torture.

(4) The offense was deliberate homicide and was committed by a person lying in wait or ambush.

(5) The offense was deliberate homicide and was committed as a part of a scheme or operation which, if completed, would result in the death of more than one person.

(6) The offense was deliberate homicide as defined in subsection (1)(a) of 94–5–102 and the victim was a peace officer killed while performing his duty.

(7) The offense was aggravated kidnapping which resulted in the death of the victim.

95–2206.9. Mitigating circumstances. Mitigating circumstances are any of the following:

(1) The defendant has no significant history of prior criminal activity.

(2) The offense was committed while the defendant was under the influence of extreme mental or emotional disturbance.

(3) The defendant acted under extreme duress or under the substantial domination of another person.

(4) The capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was substantially impaired.

(5) The victim was a participant in the defendant's conduct or consented to the act.

(6) The defendant was an accomplice in an offense committed by another person, and his participation was relatively minor.

(7) The defendant, at the time of the commission of the crime, was less than 18 years of age.

(8) Any other fact exists in mitigation of the penalty.

95–2206.10. Consideration of aggravating and mitigating factors in determining sentence. In determining whether to impose a sentence of death or imprisonment, the court shall take into account the aggravating and mitigating circumstances enumerated in 95–2206.8 and 95–2206.9 and shall impose a sentence of death if it finds one or more of the aggravating circumstances and finds that there are no mitigating circumstances sufficiently substantial to call for leniency. If the court does not impose a sentence of death and one of the aggravating circumstances listed in 95–2206.8 exists, the court may impose a sentence of imprisonment for life or for any term authorized by the statute defining the offense.

95–2206.11. Specific written findings of fact. In each case in which the court imposes the death sentence, the determination of the court shall be supported by specific written findings of fact as to the existence or nonexistence of each of the circumstances set forth in 95–2206.8 and 95–2206.9. The written findings of fact shall be substantiated by the records of the trial and the sentencing proceeding.

95–2206.12. Automatic review of sentence. The judgment of conviction and sentence of death are subject to automatic review by the supreme court of Montana as provided for in 95–2206.13 through 95–2206.15.

95–2206.13. Review of death sentence—priority of review—time for review. The judgment of conviction and sentence of death are subject to automatic review by the supreme court of Montana within 60 days after certification by the sentencing court of the entire record unless the time is extended by the supreme court for good cause shown. The review by the supreme court has priority over all other cases and shall be heard in accordance with rules promulgated by the supreme court. The sentence review shall be in addition to direct appeal, if taken, and the review and appeal shall be consolidated for consideration.

95–2206.14. Transcript and records of trial transmitted. The clerk of the trial

court, within 10 days after receiving the transcript, shall transmit the entire record and transcript to the supreme court.

95–2206.15. Supreme court to make determination as to the sentence. The supreme court shall consider the punishment as well as any errors enumerated by way of appeal. With regard to the sentence, the court shall determine:

(1) whether the sentence of death was imposed under the influence of passion, prejudice, or any other arbitrary factor;

(2) whether the evidence supports the judge's finding of the existence or nonexistence of the aggravating or mitigating circumstances enumerated in 95–2206.8 and 95–2206.9; and

(3) whether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant. The court shall include in its decision a reference to those similar cases it took into consideration.

REINHARDT, Circuit Judge, concurring:

Today, more than thirteen years after a state court levied an unconstitutional death sentence against Dewey Coleman, a federal court has invalidated that punishment. While the majority properly considers only one of Montana's unlawful acts, the fact remains that the state's prosecutors and courts committed a series of errors that are extraordinary both for their breadth and their egregiousness.[1] The history of Montana's unrelenting effort to hang Dewey Coleman illustrates not only the failings of our legal system but also its saving graces. In a more perfect world, Dewey Coleman would not have lived under a death sentence for over a decade, and protracted litigation would not have sapped the limited resources of state and federal courts. In a less perfect world, a court system that had grown impatient with his numerous appeals would already have overseen Dewey Coleman's execution.

I write separately today not to repeat any of the arguments thoughtfully presented for the court by Judge Thompson. I concur without reservation in his opinion. I add my additional comments only in order to point out that the case of Dewey Coleman illustrates the fact that curtailing the federal habeas corpus procedures in death penalty cases would seriously undermine our system of justice and our commitment to constitutional values.

I.

In 1975, Coleman was sentenced to death for the crime of aggravated kidnapping. Constitutional error riddled the proceedings.[2] Despite glaring deficiencies, it was

---

1. See Coleman v. Risley, 839 F.2d 434, 465 (9th Cir.1988) (Reinhardt, J., dissenting) (discussing those errors in detail).

2. The constitutional problems can be roughly divided into four categories of error: the Equal Protection Clause, sentencing procedures, due process, and cruel and unusual punishment. First, Montana's decision to refuse plea bargaining and seek a death sentence raises serious questions of racial bias and discriminatory intent concerning which Coleman has been unable to obtain an evidentiary hearing. While the State offered Coleman's white codefendant, a hardened criminal, a life sentence, Montana refused to negotiate in good-faith with Coleman—who is black—despite his lack of a criminal record or a violent past, the difficulty in prosecuting a case built almost entirely on the testimony of a confessed murderer, and substantial doubts as to his guilt. Second, during the capital sentencing phase, Coleman was denied an opportunity to present oral argument. The trial court, by formulating, writing, and distributing its final order prior to the sentencing hearing, abdicated its constitutional duty to provide the defendant a fair hearing. The trial court also unconstitutionally based Coleman's sentence on an unadjudicated offense. Third, Coleman was forced, by statute, to carry the burden of persuasion on the existence of mitigating circumstances and on the issue of whether these mitigating circumstances outweighed the aggravating circumstances, turning the normal method of proof on its head. Fourth, Coleman was ultimately sentenced to death under a new death penalty statute that was passed after he had been tried, convicted, and sentenced under an unconstitutional statute. See Maj. op. passim. Finally, an adjudication of guilt based only upon the dubious and self-interested testimony of a confessed murderer and the minimal physical evidence present here is constitutionally insufficient to support a capital sentence. See Gardner v. Florida, 430 U.S. 349, 97 S.Ct. 1197, 51 L.Ed.2d 393 (1977) (plurality opinion). In sum, serious constitutional error affected al-

not until after thirteen years and thirteen court proceedings that we finally granted relief.[3] Dewey Coleman's experience is not atypical for a death row inmate seeking constitutional relief. Many prisoners spend more than a decade on death row before federal courts vindicate their years of litigation. *See infra* § III. These peripatetic passages through our legal system have raised serious questions about both habeas corpus and the practicality of the death penalty. Critics of the former have argued that the extended process undermines judicial finality and threatens the efficient functioning of the federal courts.[4] Some have even suggested that the writ be streamlined or abolished.

I do not think that ... [the Supreme Court] ... can continue to evade some responsibility for this mockery of our criminal justice system. Perhaps out of a desire to avoid even the possibility of a "Bloody Assizes," this Court and the lower federal courts have converted the constitutional limits upon imposition of the death penalty by the States and the Federal Government into arcane niceties which parallel the equity court practices described in Charles Dickens' "Bleak House".

*Coleman v. Balkcom*, 451 U.S. 949, 958, 101 S.Ct. 2994, 2995, 68 L.Ed.2d 334 (1981) (Rehnquist, J., dissenting from denial of certiorari). I agree with Chief Justice Rehnquist that there are lessons to be gleaned from the federal habeas experience in death penalty cases; but because I believe that the substantial constitutional issues raised by defendants such as Dewey Coleman are much more than "arcane nice-

---

most every aspect of this case, from the passage of the initial Montana death penalty statute to the imposition of the current death sentence.

3. Coleman was first convicted and sentenced to death by the Sixteenth District Court of Montana in 1975. The Montana Supreme Court vacated that sentence three years later. *State v. Coleman*, 177 Mont. 1, 579 P.2d 732 (1978) (Coleman I). On remand, Coleman was again sentenced to death. The Montana Supreme Court affirmed. *State v. Coleman*, 185 Mont. 299, 605 P.2d 1000 (1979) (Coleman II). After the United States Supreme Court's decision in *Sandstrom v. Montana*, 442 U.S. 510, 99 S.Ct. 2450, 61 L.Ed.2d 39 (1979), the Montana Supreme Court reheard argument and again affirmed. *See* Coleman II. The United States Supreme Court denied certiorari. *Coleman v. Montana*, 446 U.S. 970, 100 S.Ct. 2952, 64 L.Ed. 2d 831 (1980). In early 1981, the Sixteenth District Court of Montana refused post-conviction relief. The Montana Supreme Court affirmed. *Coleman v. State*, 633 P.2d 624 (1981) (Coleman III). The United States Supreme Court denied certiorari. *Coleman v. Montana*, 455 U.S. 983, 102 S.Ct. 1492, 71 L.Ed.2d 693 (1982). Thirteen months later, Montana's highest court rejected Coleman's state habeas corpus petition. *Coleman v. Risley*, 663 P.2d 1154 (1983). On August 9, 1985, the United States District Court denied Coleman's petition of habeas corpus. A divided three judge panel of this circuit affirmed. *Coleman v. Risley*, 839 F.2d 434 (9th Cir.1988).

4. The genesis of this hostility towards habeas corpus stems in part from a widely shared misperception of a habeas explosion. *See* Smith, *Title 28, § 2255 of the U.S.Code*, 40 Notre Dame Law. 171, 175–76 (1964) (listing filing statistics to demonstrate 'abuse' of the writ). Statistics do not support this picture of a beleagured federal judiciary. Since separate habeas statistics were first compiled in 1971, the number of claims per prisoner has steadily declined. Although growth in the overall prison population has offset this per capita decline, there has also been a steady growth in the number of federal district court judges and magistrates. Over a long-term perspective—since 1944—the burden on the federal courts of successive habeas petitions has increased, but "the rhetoric of the boom has outlasted the reality.... prisoner's habeas petitions have declined, and that decline began in the early 1970's long before the major cases and rules restructuring habeas relief were in place." Resnick, *Tiers*, 57 So.Cal.L.Rev. 837, 950 (1984). In 1971, at their peak, habeas petitions occupied over 12% of the federal docket; that number dwindled to 5% twelve years later. In addition, while 6.1% of all civil cases reach trial, only 2.4% of habeas cases proceed to the trial stage. *Id.* at 947, *citing* Annual Report of the Director of the Administrative Office of the United States Courts 60 (1982). Thus, the evidence does not support the portrait of a federal judicial system tottering under the weight of successive habeas papers. On the other hand, *death penalty* habeas cases raise questions of a different magnitude. The severity of capital punishment mandates greater scrutiny of the merits of death row appeals. Since questions of death penalty law often involve complex factual and doctrinal inquiries, death penalty petitions—unlike many other habeas cases—are more likely to survive motions to dismiss or other summary motions. Consequently, these complex questions, fueled by recent expansions in the death penalty, demand a significant amount of the federal courts' attention. *See infra* § IV.

ties", I would conclude that the mockery of our criminal justice system lies not in repetitive federal review but in the persistent disregard by our courts of fundamental constitutional rights.

## II.

No analysis of the habeas process is complete without consideration of its historical background. The story of the Writ of Habeas Corpus begins with the birth of the English Common Law. *See* C. Antieau, *The Practice of Extraordinary Remedies* 1 (1987). The Great Writ "is perhaps the most important writ known to the constitutional law of England, affording as it does a swift and imperative remedy in all cases of illegal restraint or confinement." *Secretary of State for Home Affairs v. O'Brien*, 1923 A.C. 603, 609 (H.L.). Its lineage in American jurisprudence is no less august, extending from the earliest days of colonial law through the Constitution[5] to modern times. Although in form simply a method of procedure, the writ of habeas corpus has long stood as a bulwark against arbitrary and illegal imprisonment; "its history is inextricably intertwined with the growth of fundamental rights of personal liberty." *Fay v. Noia*, 372 U.S. 391, 401, 83 S.Ct. 822, 828, 9 L.Ed.2d 837 (1963). In many ways, the history of the Great Writ is the history of constitutional liberty in this country.

The historical role of federal habeas review of state proceedings has been more limited. The contours of federal habeas jurisdiction were sketched in the first days of the new country but were not significantly expanded until the Judiciary Act of 1867.[6] The reach of the writ into state prisons has varied with the ebb and flow of Supreme Court jurisprudence. The *Noia*

Court extended the Great Writ deep into state court adjudication, but recent cases have invoked procedural doctrine to bar certain claims in federal court. *See, e.g., Wainwright v. Sykes*, 433 U.S. 72, 97 S.Ct. 2497, 53 L.Ed.2d 594 (1977) (adopting the cause and prejudice test for unlitigated state claims). These erosions of the Great Writ, however, have not robbed it of its essential value. "If the States withhold effective remedy, the federal courts have the power and the duty to provide it." *Noia*, 372 U.S. at 441, 83 S.Ct. at 850. Habeas corpus process over state incarceration still stands as a basic safeguard of our liberties.[7]

## III.

While the historical role of the writ of habeas corpus illustrates its significance in American law, modern practice underscores the need for its continued vitality. Dewey Coleman's passage through the Montana judicial system symbolizes a problem plaguing death penalty litigation generally. Between 1976 and 1983, of the 41 death penalty cases decided by the Courts of Appeals on the merits, the prisoner prevailed 30 times, or almost 75% of the time. *Barefoot v. Estelle*, 463 U.S. 880, 915, 103 S.Ct. 3383, 3406, 77 L.Ed.2d 1090 (1983) (Marshall, J., dissenting). "This record establishes beyond any doubt that a very large proportion of federal habeas corpus appeals by prisoners on death row are meritorious, even though they present claims that have been unsuccessful in the state courts, that this Court in its discretion has decided not to review on certiorari, and that a federal district judge has rejected." *Id.* To protect the rights of capital defendants, the Supreme Court has erected a complex

---

**5.** "The privilege of the Writ of Habeas Corpus shall not be suspended, unless when in cases of Rebellion or Invasion the public Safety may require it." Art. I, § 9, cl. 2.

**6.** The extent of this nineteenth century expansion has been hotly debated by courts, *compare Noia*, 372 U.S. at 415–19, 83 S.Ct. at 836–38 with *Stone v. Powell*, 428 U.S. 465, 96 S.Ct. 3037, 49 L.Ed.2d 1067 (1976), and by academics, *compare* Peller, *In Defense of Federal Habeas Corpus Litigation*, 16 Harv. C.R.–C.L.L.Rev. (1982) (ex-

tended to the limits of the Constitution) with Bator, *Finality in Criminal Law and Federal Habeas Corpus for State Prisoners*, 76 Harv.L. Rev. 441 (1963) (limited to attacks on state court jurisdiction).

**7.** Some of the most influential civil rights decisions of our time have resulted from habeas corpus petitions filed by state prisoners. *See, e.g., Gideon v. Wainwright*, 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed.2d 799 (1963); *Malloy v. Hogan*, 378 U.S. 1, 84 S.Ct. 1489, 12 L.Ed.2d 653 (1964).

structure of procedural and substantive rules. However, these protections, often casually treated by state courts, would be rendered virtually meaningless if federal habeas were to disappear. The statistics show convincingly and the experience of Dewey Coleman illustrates that any curtailment of the writ of habeas corpus would be tantamount to federal collaboration in a scheme to deny death row inmates their constitutional rights.

Critics have charged that the high rate of successful habeas appeals signals not an inability of state courts to adjudicate constitutional rights but rather heightened sensitivity of federal courts to death row inmates. While it is true that the federal courts scrutinize death penalty appeals more closely than other cases, the judiciary is doing nothing more than following established constitutional doctrine. "Death, in its finality, differs more from life imprisonment than a 100–year prison term differs from one of only a year or two. Because of that qualitative difference, there is a corresponding difference in the need for reliability in the determination that death is the appropriate punishment in a specific case." *Woodson v. North Carolina,* 428 U.S. 280, 305, 96 S.Ct. 2978, 2991, 49 L.Ed. 2d 944 (1976) (plurality opinion). I find it troubling that the most determined attacks on the habeas process have come in an area of litigation where the stakes are so high, and the cost of error equals a man's life.

It is difficult to disagree with the Chief Justice that the results of death penalty litigation threaten to make a mockery of the criminal justice system. However, it is not frivolous appeals or complicitous judges that shake confidence in fair adjudication; rather, "it is difficult to avoid the suspicion that our criminal justice system impeaches its own integrity by producing reversible errors in between half and three-quarters of its [death penalty] cases." Burt, *Disorder in the Court: The Death Penalty and the Constitution,* 85 Mich.L. Rev. 1741, 1793 (1987). When state court judges ignore fundamental principles of constitutional law,[8] the basic premises of the judicial system are shaken; the vast array of errors encourages speculation about the impartiality and detachment necessary to fair adjudication. This case is a prime example. The Montana Supreme Court had a number of opportunities to correct what amounts to a primer of constitutional error: race and equal protection, due process, cruel and unusual punishment. Yet, the majority of the court failed to do so and experienced little difficulty in rejecting Coleman's claims.[9] Given the unwillingness or inability of some state courts to vindicate federal constitutional rights, habeas review of their judgments remains a necessary, as well as desirable, element of our federal system.

### IV.

While disagreements over the death penalty habeas process continue to fester, both proponents and opponents of the death penalty agree on at least one issue, that death penalty litigation threatens effective administration of the law. Unlike many ha-

---

**8.** The high state court error rate stems from several sources. First, despite Justice Powell's protestations to the contrary, *see Stone v. Powell,* 428 U.S. at 493 n. 35, 96 S.Ct. at 3052 n. 35, experience suggests that federal courts stand in a better position to adjudicate constitutional rights. This may be a function of greater receptivity of federal courts to Supreme Court dictates, insulation from majoritarian pressures, and even superior technical competence. *See generally* Neuborne, *The Myth of Parity,* 90 Harv.L.Rev. 1105 (1977). The recent experience of California's Supreme Court forcefully shows that the system of direct election of judges can impose public opinion upon 'politically-neutral' constitutional interpretations. Second, mere redundancy of federal review of state imprisonment poses a formidable barrier to high error

rates. Each successive decision diminishes the possibility of unconstitutional executions. For the mathematics of redundancy, *see* Cover & Aleinikoff, *Dialectical Federalism: Habeas Corpus and the Court,* 86 Yale L.J. 1035, 1045 (1977).

**9.** In *Coleman I,* the court, squarely faced with a recent controlling United States Supreme Court precedent, was compelled to correct an earlier constitutional violation in the initial sentence 579 P.2d at 741–42. Thereafter, the Montana Supreme Court had three opportunities to correct the fundamental constitutional errors raised in the habeas petition. In all three instances, the majority incorrectly denied relief.

beas cases which can be disposed of on the pleadings, *see supra* n. 4, the gravity of capital cases coupled with the startling high rate of state error mandates intensive federal scrutiny. Dewey Coleman's case is again illustrative. Over seven years has passed since a habeas petition was docketed with the federal district court for Montana; both a three judge and an en banc panel of this court ultimately subjected his claims to intense review.[10] This single case tied up significant federal resources over the last seven years, and there are two hundred more potential death penalty litigants living on death row in California alone. Across the country, the number of potential petitioners has grown rapidly. At the beginning of 1985, there were 1420 inmates on death row in the United States; by the end of the year, 171 prisoners had been added to the executioner's ledger. By March, 1987, 1,874 inmates languished on death row, an increase of approximately 32% over a 2½ year period. *See* Bureau of Justice Statistics, U.S. Department of Justice, Sourcebook of Criminal Justice Statistics 1986 at 428–29 (1987). This increase in the number of death row inmates will be reflected in the number of habeas petitions. In fiscal year (FY) 1988, the number of new death penalty cases entering the federal court system is estimated to be approximately 300. In FY 1989, an estimated 345 more death row inmates will file habeas petitions in the federal courts. In FY 1990, we can expect another 425 habeas petitions to flood the district courts. *See generally* Spangenberg Group, Time and Expense Analysis in Post–Conviction Death Penalty Cases (1988); Spangenberg Group, Caseload and Cost Projections for Federal Habeas Corpus Death Penalty Cases in FY 1988 and FY 1989 (1988).[11] Because of California's frequent invocation of the death penalty, the Ninth Circuit will bear a

substantial part of the burden. An estimated 76 new death penalty cases will confront this court in 1989, and the number of new entrants will rise to approximately 95 in 1990. *Id.* If we properly review these habeas petitions, we will be unable to handle our ordinary calender of civil and criminal cases in an efficient and orderly manner.

Since it takes an average of over seven years from the date of sentencing to properly adjudicate a death penalty claim, collateral attacks on capital sentences will create a massive backlog in the federal system. Given the nature of the punishment and the high rate of state court errors, the federal courts must continue to scrutinize these cases with utmost care. But the costs of the fair and accurate adjudication mandated by the Constitution are extremely high; the limited capacities of the district and circuit courts will be challenged, and the ability of the federal system to handle the pressing business of other litigants will be diminished. As long as capital punishment is condoned in our country, extensive review of the death penalty must remain a priority of the federal courts, but, as the figures indicate, this mandatory review will exact a price in the impaired administration of our civil and criminal dockets.

## V.

In 1975, Dewey Coleman was sentenced to death; while state and federal courts debated the merits of his claim, he languished on death row for over thirteen years. A great deal of time, effort, and money, both public and private, has been expended, but the fact that this case has finally been adjudicated properly makes the process worthwhile.[12] I realize that there

---

10. The majority and dissenting opinions of the three-judge panel cover 90 pages in the federal reporter. 839 F.2d at 434–523. While I am not certain that mere volume is a perfect indicia of the extent of judicial scrutiny, I suspect that there is, on some occasions at least, a basic correlation.

11. The Spangenberg Group's projections of habeas corpus petitions in the federal court system

derive from a 50 state survey of Attorney General's Offices and Public Defender's statistics. The estimates closely match the figures compiled by the NAACP.

12. I am confident that the death penalty litigation in Coleman's case has now drawn to a close. Although the majority opinion properly does not reach the hypothetical question whether a new death sentence could be imposed if

are other values—such as finality—that are important to the judicial process, but when the stakes are a man's life, these values pale in comparison to accurate and fair adjudication. If cumbersome administration of the death penalty threatens efficient handling of all other civil and criminal matters, and some changes must therefore be made with respect to death penalty cases, the answer lies not in restricting legitimate appeals but in rethinking the social utility of the death penalty. Until legislatures reassess the wisdom of capital punishment [13], exacting scrutiny of capital cases will continue to be the duty of the federal courts. And as long as state courts unconstitutionally sentence defendants to death, the only choice allowed by our laws is for the federal courts to put their judgments to the highest tests of the Constitution.[14]

TROTT, Circuit Judge, joined by Circuit Judge DAVID R. THOMPSON, concurring:

Peggy Lee Harstad was viciously murdered on July 4, 1974. That this case is still being litigated over fourteen years later does not speak well of our system of justice. The prolongation of such a matter can only have the effect of preventing her family, friends, and community from coming to peace with this horrendous event—if that is possible. Litigants, too, deserve speedier results. All of us responsible for the anemic pace of justice should reflect on every ramification of this delay and rededicate ourselves to doing everything within our power to make sure that the difficult and important decisions that are committed to us are made as expeditiously as possible. As Chief Judge Clark said in *Brogdon v. Butler*, 824 F.2d 338, 343 (5th Cir.1987) (Clark, C.J., concurring), "Justice requires that in each instance capital punishment be imposed with maximum assurance of scrupulous legality. But, justice equally demands an assurance that such punishment be imposed when the minds of men still retain memory of the crime committed."

I agree with Judge Reinhardt's assessment of the enormous and taxing death penalty workload that looms on the horizon. I respectfully disagree, however, that workload is a reason to rethink the social utility of the death penalty. Where it is the law, it represents the people's views expressed through democratic institutions regarding the appropriate punishment for the most heinous of criminal acts. Rather than surrender to the challenge of handling these difficult cases with judicious alacrity, I find it preferable to expand or streamline the system to handle the load.

I also must take issue with my colleague's statement that Montana's prosecutors and courts necessarily committed "a series of errors that are extraordinary for their breadth and egregiousness." It is useful to put this case in context to remember that Coleman at one point tried to plead guilty while simultaneously proclaiming he

Coleman sought and obtained a new trial and was again convicted, I think the answer to the question is plain. As Judge Thompson eloquently writes for the en banc court, "Because Coleman had no reason to suspect that his decisions at trial would come back to haunt him at a sentencing hearing, we must conclude that he was denied due process when he was resentenced to death under Montana's revised death penalty statute." Majority Op. at 1288. The reasoning is necessarily applicable to any future death sentence imposed on Coleman for the crimes on which he has heretofore been tried. The record of the first trial can never be undone. Any future trial decisions Coleman would make would inevitably be affected by the trial record his counsel has already created.

13. Among Western nations, retention of the death penalty is a rarity. In Western Europe, eight countries nominally keep death penalty statutes on the books. In five of those nations—Italy, Malta, Spain, Switzerland, and England—the laws permit capital sentences only for exceptional crimes, such as wartime treason. The other three—Belgium, Greece, and Ireland—retain the death penalty for ordinary homicide. But not one of the eight countries has executed a prisoner within the last decade. *See* Amnesty International, Death Penalty List of Abolitionist and Retentionist Countries (1988). Clearly, the process of reassessment has taken a different turn in other developed societies.

14. It would, of course, be inappropriate to comment here on the recently enacted federal legislation which provides for the imposition of the death penalty in certain cases. *See* Title VII of the Anti-Drug Abuse Act, P.L. 100-690. No case has yet been decided under that statute.

was the innocent victim of racial bias. Then, after the administration of "truth serum," a drug known on occasion to produce unreliable results, his attorney abruptly indicated Coleman was prepared to admit to his part in the kidnap, rape, and murder. With this series of events in mind, it is not appropriate to reject summarily a state prosecutor's explanation for his reluctance to accept a plea of guilty from a man who first said he was innocent, then in an abrupt, about-face apparently said he was guilty (after being given sodium amytal), and finally went to trial on the theory that he was blameless. Many respected trial judges might well have declined to accept such a plea because of its obvious defects.

Had Montana accepted either of Coleman's pleas, it is clear beyond cavil that Coleman would have eventually mounted a collateral attack against his conviction, claiming an innocent black man under the influence of drugs had been coerced into pleading guilty and sent to jail for life for a crime he did not commit. Had he been successful in invalidating such a plea, Montana would have had to try Coleman years later with evidence that might have deteriorated beyond resurrection. Had Nank died or escaped in the interim, Montana's case might have been nonexistent, and Coleman might have escaped trial altogether. This would have been unacceptable. It is therefore not beyond understanding that the State refused to plea bargain and opted instead to go to trial.

Montana was under no obligation to plea bargain at all. *See Weatherford v. Bursey,* 429 U.S. 545, 561, 97 S.Ct. 837, 846, 51 L.Ed.2d 30 (1977). Also, a plea tendered pursuant to *North Carolina v. Alford,* 400 U.S. 25, 91 S.Ct. 160, 27 L.Ed.2d 162 (1970) will not stand—nor should it—without a strong factual basis and a clear showing that it was the product of a free will. Montana's Hobson's choice under these difficult circumstances to put its case before a jury, therefore, is hardly conclusive grounds for castigation. As the Supreme Court noted in *Singer v. United States,* 380 U.S. 24, 36, 85 S.Ct. 783, 790, 13 L.Ed. 2d 630, 638 (1965), our Constitution regards

a trial by jury as the best way to produce a fair result. The cruel and savage facts in this case also make it evident that Montana's selection of capital punishment falls short of shocking a reasonable person's conscience. *See Burger v. Kemp,* 483 U.S. 776, 107 S.Ct. 3114, 97 L.Ed.2d 638 (1987).

I concur generally in Judge Thompson's analysis of the due process problem in this case, but only as it relates to the issue of Coleman's present sentence. Because of the procedures in place at the time of the commencement of Coleman's trial in October 1975, his counsel was required to make important tactical decisions without being able to gauge their impact on a nonexistent post-conviction death penalty hearing. Anyone familiar with death penalty cases knows the issues confronting defense counsel highlighted by Judge Thompson are real. This is not a matter of speculation. The law in Montana had not yet provided for a separate hearing on the issue of punishment and did not do so until 1977. It is for this reason that Coleman's sentence must be reversed.

Judge Wallace in his concurring and dissenting opinion makes a very strong case for an evidentiary hearing on the issue of whether the due process violation was harmless beyond a reasonable doubt. Were it not for the fact that Coleman's counsel himself brought Nank and Coleman's involvement in a robbery to the attention of the jury. I might agree. But this makes it virtually certain in my judgment that the error cannot be said to have been harmless beyond a reasonable doubt.

In one sense, this case is a victim of the turbulence generated in 1972 by *Furman.* New procedural guidelines for the administration of capital punishment were mandated. Virtually every state where capital punishment was on the books, including Montana, had to amend its laws to conform to the new rules. This took time. The choices were difficult, the drafting complex. The Supreme Court provided little guidance. Many cases, including this one, suffered as a consequence. That the path is difficult, however, is not sufficient reason to abandon a constitutional avenue cho-

sen by the people. As an ancient Greek philosopher once said, "It is a painful thing to look at your own trouble and know that you yourself and no one else had made it." Sophocles, *Ajax* (c. 447 B.C.) (John Moore trans.).

WALLACE, Circuit Judge, concurring in part and dissenting in part:

I agree with the majority that there was no infringement of Coleman's sixth amendment right to an impartial jury and, therefore, concur in part II of the opinion. I also agree with part III to the extent that resentencing Coleman under Montana's 1977 death penalty statute violated his due process rights. I disagree, however, with part III's statement that "[i]t would be fruitless in this case to require trial counsel to provide a record of how he or she would have handled the case differently." Maj. op. at 1289. Rather, I would remand for an evidentiary hearing to determine whether the due process violation was harmless beyond a reasonable doubt under *Chapman v. California*, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967) (*Chapman*). As the Court recently held in *Rose v. Clark*, 478 U.S. 570, 106 S.Ct. 3101, 92 L.Ed.2d 460 (1986), "while there are some errors to which *Chapman* does not apply, they are the exception and not the rule....[I]f the defendant had counsel and was tried by an impartial adjudicator, *there is a strong presumption* that *any other errors*...are subject to harmless-error analysis." *Id.* at 578–79, 106 S.Ct. at 3106–07 (citation omitted) (emphasis added). Under this holding, we should apply this strong presumption in this case. I do not see how the majority has rebutted this strong presumption.

Though brought under the due process clause, Coleman's argument closely resembles an *ex post facto* claim. *See* Maj. op. at 1286. The majority would add this new kind of due process violation to the restricted list of constitutional errors which require per se reversal. *Id.* at 1288–89. According to the majority, this due process violation had so pervasive an effect on the record that we, as a reviewing court, cannot determine whether the error was harmless beyond a reasonable doubt. *Id.*

I agree that the record, in its present state, cannot yield an answer to the harmless error inquiry. In my view, however, the reason for this deficiency lies in the procedural posture of this case and not in the inherent nature of the right violated. The district court entered summary judgment for the State without holding an evidentiary hearing. Had it held an evidentiary hearing and considered Coleman's due process claim, the district court could have determined whether the due process violation was harmless beyond a reasonable doubt. We then would be in a position to "confidently say, *on the whole record,* [whether] the constitutional error was harmless beyond a reasonable doubt." *Delaware v. Van Arsdall*, 475 U.S. 673, 681, 106 S.Ct. 1431, 1436, 89 L.Ed.2d 674 (1986) (*Van Arsdall*) (emphasis added).

I

Coleman's alleged prejudice could be evaluated by the district court on remand. The majority recites three specific examples of how Coleman might have been prejudiced. According to the majority, had Coleman's counsel known that his client would be sentenced under the 1977 statute, he (1) might not have called Coleman to testify, (2) might not have brought in evidence of Coleman's prior criminal activity in his cross-examination of Nank, and (3) might have challenged the trial judge. *Id.* at 1289.

I see no reason why these (and any other) hypotheses cannot be tested in an evidentiary hearing. Coleman's counsel may well testify that, in light of other objectives, he would have called his client to the stand anyway. Even if he would not have called Coleman, it may be that Coleman's testimony was cumulative or did not contribute to the finding of any aggravating circumstance. If so, Coleman's testimony may have been harmless beyond a reasonable doubt. As for Coleman's counsel's decision to bring in evidence of Coleman's prior criminal activity, the district court

might determine that the prosecutor likely would have submitted this evidence at the sentencing hearing anyway. Given this likelihood, Coleman's counsel may testify that he still would have elicited this information during Nank's cross-examination. Finally, there may have been no good reason for Coleman to challenge the trial judge. In short, there is no reason why the examples referred to by the majority could not be tested for harmless error in an evidentiary hearing. It may be that the State would fail in its burden of proving harmlessness beyond a reasonable doubt. Even so, the issue can and should be explored.

The problem here is analogous to that in many cases involving ineffective assistance of counsel claims. Such claims are disfavored when brought on direct appeal since "usually [they] cannot be advanced without the development of facts outside the original record." *United States v. Birges*, 723 F.2d 666, 670 (9th Cir.), *cert. denied*, 466 U.S. 943, 104 S.Ct. 1926, 80 L.Ed.2d 472 (1984) and 469 U.S. 863, 105 S.Ct. 200, 83 L.Ed.2d 131 (1984), *citing United States v. Kazni*, 576 F.2d 238, 242 (9th Cir.1978). For this reason, ineffective assistance claims are usually brought in habeas proceedings, *see United States v. Pope*, 841 F.2d 954, 958 (9th Cir.1988), where an evidentiary hearing can be used to explore "what counsel did, why it was done, and what, if any, prejudice resulted." *Id.* (citation omitted). Similarly, whether the due process violation here was harmless beyond a reasonable doubt can be resolved by inquiring into Coleman's counsel's trial decisions at an evidentiary hearing.

*Tasco v. Butler*, 835 F.2d 1120 (5th Cir. 1988), also provides a useful parallel to this case. Tasco allegedly had received no notice of a recidivism charge filed against him under Louisiana's habitual offender statute until the day of the sentence enhancement hearing. Like Coleman, Tasco's federal habeas petition had been denied without an evidentiary hearing. *Id.* at 1122. The Fifth Circuit held that this alleged denial of notice would constitute a due process violation. *Id.* at 1123–24. The court then applied *Chapman's* harmless error doctrine to the violation, but concluded that "[t]he

record in this case leaves us in doubt concerning whether the due process deprivation affected the outcome of the sentence-enhancement proceeding." *Id.* at 1124. Accordingly, the court reversed the denial of Tasco's petition and remanded to the district court for an evidentiary hearing to determine "when in fact Tasco and his attorney first received notice of the recidivism charges," and, if the notice was insufficient, "whether the state has shown beyond a reasonable doubt that [Tasco] suffered no prejudice as a result." *Id.* Similarly, I would order a remand here.

## II

Why, then, should we not remand for an evidentiary hearing? The majority suggests that per se reversal is appropriate. Rather than inquire into the reasons why the record, in its present state, will not yield an answer to the harmless-error inquiry, the majority exempts Coleman's claim from harmless-error review at all because of *the nature of the violation*.

I view as distinguishable those cases in which the Supreme Court has excepted particular constitutional errors from harmless-error review because the "scope of the violation ... cannot be discerned from the record, [and therefore] any inquiry into its effect on the outcome of the case would be purely speculative." *Satterwhite v. Texas*, 486 U.S. 249, 108 S.Ct. 1792, 1797, 100 L.Ed.2d 284 (1988) (*Satterwhite*). The crucial characteristics of these cases appear to be (1) the scope of the violation cannot be determined from the record, and therefore (2) the effect of the violation on the outcome of the case cannot be determined. *See id.*

The cases usually included in this category are *Holloway v. Arkansas*, 435 U.S. 475, 98 S.Ct. 1173, 55 L.Ed.2d 426 (1978) (*Holloway*) (conflict of interest in representation throughout entire proceeding), *Gideon v. Wainwright*, 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed.2d 799 (1963) (*Gideon*) (total deprivation of counsel), and *Tumey v. Ohio*, 273 U.S. 510, 47 S.Ct. 437, 71 L.Ed. 749 (1927) (*Tumey*) (biased judge). *See Satterwhite*,

108 S.Ct. at 1797–98; *Van Arsdall*, 475 U.S. at 681–82, 106 S.Ct. at 1436–37. Before one can evaluate the differences between Coleman's due process infringement and the constitutional violations in *Holloway*, *Gideon*, and *Tumey*, however, it is necessary to understand the precise nature of the infringement in this case.

This case involves a novel type of due process claim. In challenging the retroactive application of a sentencing statute that resulted in his being resentenced to death, Coleman essentially is claiming that he was deprived of adequate notice. Maj. op. at 1288. Yet this case differs from *Marks v. United States*, 430 U.S. 188, 97 S.Ct. 990, 51 L.Ed.2d 260 (1977) (*Marks*) (fifth amendment due process clause), *Rabe v. Washington*, 405 U.S. 313, 92 S.Ct. 993, 31 L.Ed.2d 258 (1972) (per curiam) (*Rabe*) (fourteenth amendment due process clause), *Bouie v. City of Columbia*, 378 U.S. 347, 84 S.Ct. 1697, 12 L.Ed.2d 894 (1964) (*Bouie*) (same), and *In re Oliver*, 333 U.S. 257, 68 S.Ct. 499, 92 L.Ed. 682 (1948) (*Oliver*) (same). Those cases hold that the due process clause guarantees the right to fair warning of what conduct or actions are subject to criminal liability. *Marks*, 430 U.S. at 191, 97 S.Ct. at 992; *Bouie*, 378 U.S. at 354–55, 84 S.Ct. at 1702–03 ("When a[n] ... unforeseeable state-court construction of a criminal statute is applied retroactively to subject a person to criminal liability for past conduct, the effect is to deprive him of due process of law in the sense of fair warning that his *contemplated conduct constitutes a crime.*") (emphasis added). *Marks, Rabe, Bouie*, and *Oliver* each disallowed the retrospective application of "[a]n unforeseeable judicial enlargement of a criminal statute." *Marks*, 430 U.S. at 192, 97 S.Ct. at 993, *quoting Bouie*, 378 U.S. at 353, 84 S.Ct. at 1702. Here, by contrast, there is no question that Coleman had adequate notice of the conduct that constituted aggravated kidnapping under Montana law. He also had adequate notice that aggravated kidnapping carried the death penalty under Montana law, though the state's mandatory provision was later struck down. *See* Maj. op. at 1282. Coleman's notice of the resentencing procedures was also adequate to prepare for the resentencing hearing itself. *See Coleman v. Risley*, 839 F.2d 434, 451–54, 460–61 (9th Cir.) (panel opinion), *reh. en banc granted*, 845 F.2d 884 (9th Cir.1988). Thus, Coleman was deprived of adequate notice only in the following, limited sense: by not knowing that he would ultimately be subject to the 1977 sentencing statute, he did not have adequate notice that his *decisions at trial* might have an impact on his sentencing under the new scheme. The only reason these trial decisions could possibly prejudice Coleman is the 1977 statute's directive that the sentencing judge consider any evidence, regardless of its content, which was admitted during the guilt phase. *See* Mont.Code Ann. § 95–2206.7.

Thus, aside from one exception I will analyze later, Coleman could have been prejudiced by the retrospective application of the sentencing statute only insofar as his lack of notice *was actually reflected in the state trial record*. That is, only if Coleman's counsel introduced damaging evidence into the record at trial could lack of notice have prejudiced Coleman at the sentencing hearing. Any trial decision resulting in the failure to introduce beneficial evidence at trial could not possibly have prejudiced Coleman's sentencing, because such evidence could have been introduced at the sentencing hearing. *See id.*

Bearing this in mind, I will now apply the *Satterwhite* analysis to consider whether this type of violation is one (A) whose scope cannot be determined from the record, and therefore (B) which has an effect on the case's "outcome" that cannot be determined beyond a reasonable doubt. 108 S.Ct. at 1797.

## A.

*Tumey, Gideon*, and *Holloway* all involve violations whose scope is pervasive and cannot be determined from the record. If a judge is biased as in *Tumey*, the bias will infect all of the judge's discretionary decisions made at trial. Similarly, the total denial of counsel as in *Gideon* will result in a record that bears little resemblance to

the record which would have been created with representation. In either case, it would be virtually impossible to identify those portions of the record tainted by the violation. Moreover, there are other practical difficulties which these cases present. If a judge is truly biased, it would be fruitless to conduct an evidentiary hearing examining what the judge would have done without the bias. Similarly, where counsel has been denied, it may be impossible to know who the counsel would have been and what effect he or she would have had on the trial.

*Holloway* presents a slightly different situation, though it too is distinguishable from this case. In *Holloway,* the Court held that whenever a trial court improperly requires, over timely objection, an attorney to undertake joint representation of codefendants with conflicting interests, the error requires automatic reversal. 435 U.S. at 489–91, 98 S.Ct. at 1181–82. In so holding, the Court wrote:

> In the normal case where a harmless-error rule is applied, the error occurs at trial and its scope is readily identifiable. Accordingly, the reviewing court can undertake with some confidence its relatively narrow task of assessing the likelihood that the error materially affected the deliberations of the jury. But in a case of joint representation of conflicting interests the evil—it bears repeating—is in what the advocate finds himself compelled to *refrain* from doing, not only at trial but also as to possible pretrial plea negotiations and in the sentencing process. It may be possible in some cases to identify from the record the prejudice resulting from an attorney's failure to undertake certain trial tasks, but even with a record of the sentencing hearing available it would be difficult to judge intelligently the impact of a conflict on the attorney's representation of a client. And to assess the impact of a conflict of interests on the attorney's options, tactics, and decisions in plea negotiations would be virtually impossible.

*Id.* at 490–91, 98 S.Ct. at 1181–82 (citations omitted) (emphasis in original). Thus, *Holloway* turned in part on the fact that the conflict of interest would likely have an effect on unrecorded proceedings, such as plea negotiations. This is simply not the case here. Coleman could only have been prejudiced by the retrospective application of Montana's sentencing insofar as his lack of notice was actually reflected in the state trial court record.

In a more general sense, the error here had a more circumscribed and discernible impact on the record than the violations in *Holloway, Tumey,* and *Gideon.* The set of incentives faced by Coleman's counsel in the guilt phase roughly corresponded to those presented in the sentencing phase of the later-enacted sentencing scheme. His lack of knowledge regarding the new sentencing procedure could only have prejudiced his client if it resulted in his putting into the record evidence which would have either (1) supported the finding of an aggravating circumstance, or (2) weighed against the finding of a mitigating circumstance. *See* Mont.Code Ann. § 95–2206.10. Evidence favorable to Coleman which was omitted by counsel from the trial record could always be submitted later at the sentencing hearing. Thus, the scope of the violation here was more circumscribed and easier to discern from the record.

There is only one exception in which the state trial record would not be adequate: the majority's contention that Coleman would have challenged the trial judge had he known the trial judge would have the discretion to impose the death penalty. But if Coleman's counsel had serious doubts about the trial judge's fairness or impartiality, then he likely would have requested substitution anyway. The majority argues, however, that "[i]t is one thing to accept a judge for the purpose of conducting a fair trial, and quite another to accept that judge ... to become the *sole decisionmaker* on the question of life or death." Maj. op. at 1287 (emphasis added). This argument overestimates both the amount of discretion accorded the sentencing judge under Montana law and the willingness of Coleman's counsel to endure a biased judge for the trial but not the sentencing phase. Furthermore, Coleman

himself has never suggested to this court that he would have challenged the trial judge. Rather, this hypothetical scenario is a product of the majority's quest to conjure up ways in which Coleman might have been harmed. In my view, this contention's origin provides all the more reason why it should be tested at an evidentiary hearing. Such a hearing would supplement the trial record and provide an adequate basis for harmless error analysis of this contention. Just because Coleman's counsel *could* have challenged the trial judge without cause, *see* maj. op. at 1287, 1289, does not necessarily mean that we should automatically assume he would have done so, or that, had he done so, the outcome necessarily would have been different.

### B.

It might be argued that where the "outcome" is a death sentence, harmless error analysis is never applicable. The Supreme Court has rejected this view, and has repeatedly applied harmless error analysis to capital sentencing proceedings. *E.g., Satterwhite,* 108 S.Ct. at 1797–98; *Hitchcock v. Dugger,* 481 U.S. 393, 399, 107 S.Ct. 1821, 1824, 95 L.Ed.2d 347 (1987) (reversing death sentence because there was constitutional error and state did not show error was harmless); *Skipper v. South Carolina,* 476 U.S. 1, 7–9, 106 S.Ct. 1669, 1672–74, 90 L.Ed.2d 1 (1986) *(Skipper)* (implicitly rejecting idea in concluding that error was not harmless). In *Satterwhite,* the Court held that "a reviewing court can make an intelligent judgment about whether the erroneous admission of psychiatric testimony might have affected a capital sentencing jury." 108 S.Ct. at 1798. By contrast, *Skipper* evaluated the harmfulness of the *exclusion* of particular mitigating evidence from the capital sentencing phase. 476 U.S. at 7–8, 106 S.Ct. at 1672–73.

Turning to whether the "outcome" in this case can be determined beyond a reasonable doubt, I believe that Montana's sentencing procedure channels the sentencing judge's discretion in such a way that a

reviewing court can evaluate the effect of Coleman's due process violation on the sentence imposed. The sentencing determination under Montana law is based on the presence or absence of statutorily defined mitigating and aggravating circumstances. Mont.Code Ann. §§ 95–2206.8, 95–2206.9. Moreover, if the death penalty is imposed, the sentencing judge must make specific written findings of fact regarding the presence or absence of each of the aggravating and mitigating circumstances. Mont.Code Ann. § 95–2206.11. These findings must be "substantiated by the records of the trial and the sentencing proceeding." *Id.* Under this regime, the impact of the error is more readily ascertainable than when the reviewing court must judge the error's impact on the jury's final, unexplained decision of guilty or innocent. Similarly, the impact under the Montana capital sentencing procedure is more easily determined than under proceedings in which a jury makes the capital sentencing determination without making specific written findings. *See, e.g., Satterwhite,* 108 S.Ct. at 1795, 1797–98 (applying harmless error review where capital sentencing jury answers two statutorily prescribed questions); *Skipper,* 476 U.S. at 2–3, 7–9, 106 S.Ct. at 1669–70, 1672–74 (implicitly applying harmless error review where capital sentencing jury returns final, unexplained decision whether to execute). If harmless error review could be applied under the schemes in *Satterwhite* and *Skipper,* then *a fortiori* we could apply it to the Montana procedure.

Moreover, this approach makes sense for one additional reason which is worth pointing out. Treating *ex-post-facto*-type due process violations as requiring automatic reversal would make little sense in light of *ex post facto* jurisprudence. Under that body of law, neither a procedural nor an ameliorative change in the law is actionable. *Dobbert v. Florida,* 432 U.S. 282, 292–97, 97 S.Ct. 2290, 2297–3009, 53 L.Ed. 2d 344 (1977). Here, the change in the Montana law appears to have been both procedural and ameliorative. The determination under the *ex post facto* clause whether the challenged law is ameliorative is the functional equivalent of a harmless

error analysis. Thus, under the *ex post facto* clause, as part of the inquiry into whether the right has been violated, courts examine whether the claimant was disadvantaged or harmed by the change in law. *See* 3 W. LaFave & J. Israel, *Criminal Procedure* § 26.6 at 59 (1988 Supp.) (describing category of cases "characterized by a finding of prejudicial impact in the determination that there was a constitutional violation" and stating that "[w]here a court has made such a finding ... (as where it concludes that counsel's representation was ineffective under the *Strickland* [*v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984)] standard, or that nondisclosed exculpatory evidence was material under the [*United States v. Bagley*, 473 U.S. 667, 105 S.Ct. 3375, 87 L.Ed. 2d 481 (1985)] standard), then there is no reason to superimpose the *Chapman* standard to determine whether a new trial is necessary"). To allow litigants to repackage their *ex post facto* challenges to ameliorative laws as due process claims requiring per se reversal would in effect eliminate a significant limitation in *ex post facto* doctrine.

### III

For the foregoing reasons, I would hold that the due process violation in this case is subject to harmless error analysis. I express no opinion whether the error was in fact harmless beyond a reasonable doubt. I would remand to the district court for an evidentiary hearing.

ALARCON, Circuit Judge, concurring in part and dissenting in part:

I concur in that portion of the majority's opinion that holds that the record does not support Mr. Dewey Coleman's claim of a violation of his right to an impartial jury at the guilt phase of his trial. I dissent from the majority's conclusion that Mr. Coleman's claim, that he was selected for prosecution and convicted solely because he is a black man, need not be resolved in this appeal. If Mr. Coleman was selected for prosecution and convicted in violation of his right to equal protection, any question concerning the validity of the punishment later imposed by the sentencing court would clearly be moot. The majority has not explained why it determined that it was required to reach Mr. Coleman's contention that the jury that *convicted* him was improperly selected while, at the same time, apparently concluding that it was unnecessary to decide the remainder of his constitutional challenges to the *guilt* phase of the trial.

### I

Mr. Coleman, a black man, has asked this court to order the district court to grant him an evidentiary hearing so that he may offer evidence in support of his contention that he was invidiously subjected to selective prosecution, represented by ineffective counsel, and convicted of three crimes based upon legally insufficient evidence, notwithstanding his innocence, in violation of his federal constitutional rights. In a brief and enigmatic footnote, the majority has expressly declined to review the merits of these serious constitutional challenges, which, if true, should entitle him to a new trial if not immediate freedom from further incarceration. The majority appears to have ignored the Supreme Court's instruction that in considering a capital case "the severity of the sentence mandates careful scrutiny in the review of *any colorable claim of error.*" *Zant v. Stephens*, 462 U.S. 862, 885, 103 S.Ct. 2733, 2747, 77 L.Ed. 2d 235 (1983) (emphasis added). Because I believe that the failure of the majority to determine the merits of each of Mr. Coleman's allegations of grave constitutional error concerning the *guilt* phase of his trial may result in the continued confinement of a state prisoner—who may be innocent— for the rest of his life, I cannot join in the majority's advisory opinion concerning the validity of the punishment imposed for the commission of *one* of these crimes.

### II

Over thirteen years ago, Mr. Coleman was convicted by a Montana jury of deliberate homicide, aggravated kidnapping, and sexual intercourse without consent, with

bodily injury (forcible rape). He is presently serving a sentence of 100 years for deliberate homicide and a consecutive sentence of 20 years for forcible rape. *Coleman II*, 185 Mont. 299, 605 P.2d 1000, 1007 (1979). He also received a sentence of death for the crime of aggravated kidnapping.

Mr. Coleman claims that he is innocent and was selected for prosecution and convicted solely because he is black. The Montana courts refused to grant Mr. Coleman an opportunity to prove that he is the victim of selective prosecution and other serious constitutional violations which, if true, would compel reversal of his convictions and the restoration of his freedom. Having exhausted his state remedies, Mr. Coleman exercised his right under 28 U.S.C. § 2254 to petition the federal courts to hear his evidence that he was selected for prosecution and convicted solely because he is a black man.

The district court dismissed Mr. Coleman's petition without a hearing. A three-judge panel of this court heard Mr. Coleman's appeal from the denial of his petition for a writ of habeas corpus. Two of the judges concluded that the record failed to support Mr. Coleman's contention that "he was tried, convicted, and sentenced to death as a result of pervasive racial discrimination." *Coleman v. Risley*, 839 F.2d 434, 450 (9th Cir.1988). Our dissenting colleague was of the view that Mr. Coleman was "entitled at the least, to a full and fair hearing on [the equal protection claim] in the district court." *Id.* at 482. In a subsequent passage, the dissent argued that "where the defendant establishes a prima facie case of racial discrimination, we have an obligation to conduct a hearing and probe the motives of the prosecution." *Id.* at 483.

Mr. Coleman petitioned for a rehearing and suggested that such reconsideration should be conducted by an en banc panel of this court. He again argued that the record of the state court proceedings amply demonstrated that he was entitled to an evidentiary hearing to prove that he was selected for prosecution and convicted because he is black. We granted rehearing en banc.

In its opinion, the en banc majority has failed to determine the merits of Mr. Coleman's contention that he is entitled to an evidentiary hearing to prove that he was selected for prosecution and convicted solely because of his race. Instead the majority has limited its review to a discussion of the validity of the jury selection process and the punishment imposed as the result of Mr. Coleman's conviction for the crime of aggravated kidnapping. The majority has also failed to address Mr. Coleman's remaining constitutional attacks on his *convictions* for aggravated kidnapping, deliberate homicide and forcible rape.

In refusing to consider the constitutional integrity of Mr. Coleman's convictions for deliberate homicide and forcible rape, the majority appears to have blinded itself to the fact that the prisoner was sentenced to serve 120 years for these offenses and that he seeks an evidentiary hearing in the district court so that he can demonstrate that the Montana court's judgment on the issue of guilt must be set aside.

### III

Mr. Coleman attacks the validity of his *convictions* for deliberate homicide, aggravated homicide, and forcible rape on the following grounds:

One. The evidence produced at trial was insufficient to convince a rational jury of Mr. Coleman's connection to the rape and murder of Peggy Lee Harstad. "A black man who has consistently maintained his innocence has been condemned to death, time after time, solely on the uncorroborated and incredible testimony of a white alleged accomplice who purchased his own life with his testimony." Appellant's Opening Brief, page 48. In his amended petition for a writ of habeas corpus, Mr. Coleman also challenges the trial court's failure to rule on his objection to the accomplice's mental competency to testify at the *guilt* phase of the trial.

Two. He was denied the effective assistance of counsel. Mr. Coleman as

serts that without his knowledge or consent, his first defense attorney told the trial judge that truth serum tests had revealed that his client was guilty. *"[T]his information must have colored not only the trial court's view of the nature and extent of Coleman's guilt,* but, when coupled with Coleman's extensive trial testimony protesting his innocence, must have led the trial court to conclude that Coleman was both a murderer and a perjurer." Appellant's Opening Brief, page 23. (emphasis added). See Appellant's Opening Brief, page 30 n. 1.

Three. Mr. Coleman contends that he *"was tried, convicted,* and sentenced as a result of pervasive racial discrimination." Appellant's Opening Brief page 47 (emphasis added). He argues that the trial judge's reference to Mr. Coleman as "this black boy" demonstrates racial discrimination compelling reversal of the judgment of conviction of each crime. Appellant's Opening Brief, page 47.

The majority's sole response to these constitutional challenges to the validity of the judgment of *conviction* for aggravated kidnapping, deliberate homicide, and forcible rape is contained in footnote 9 of its opinion. The majority offers the following explanation for its failure to review these colorable constitutional claims concerning the validity of the *guilt* phase of his trial:

Coleman's contention that he was prosecuted and sentenced to death, because of race discrimination when the state plea bargained with Nank, a white man, but refused to enter into a plea bargain with Coleman, who is black, does not impact his conviction of deliberate homicide. He would have been convicted upon his offer to plead guilty to this crime in any event.

Thus the majority has chosen to ignore Mr. Coleman's claim that, notwithstanding his innocence, he was selected for prosecution solely because he is black.

If Mr. Coleman was selected for prosecution as the result of invidious discrimination based on his race, a plea resulting from the state's violation of his constitutional rights would be tainted and invalid. Contrary to the majority's conclusion, proof that the prosecution of Mr. Coleman was animated by racial discrimination would clearly "impact his conviction."

The majority has not cited any authority for its extraordinary assumption that a state prisoner whose offer to plead guilty was rejected, may be denied his right to an evidentiary hearing in order to prove that he was selected for prosecution solely because of the immutable fact that he is black. The fact that a person once offered to plead guilty to avoid the death penalty should not bar him from proving that he was selected for prosecution because of his race, especially in a case where it is alleged that the *rejection of his offer* is at least prima facie proof of racial bias.

The majority speculates in footnote 9 that *if* Mr. Coleman had entered a plea of guilty under the circumstances reflected in the record, it would have passed careful constitutional scrutiny. Without exposing its rationale, the majority appears to assume that a plea of guilty, by a person who was the victim of selective prosecution *and* injected with sodium amytol while in custody, is valid. I cannot agree. To validate a plea under such circumstances would reward outrageous governmental conduct in clear violation of a state prisoner's right to due process and equal protection.

I recognize that the Supreme Court has held that a trial judge may accept a guilty plea from a person who informs the court that he is innocent but wishes to avoid the extreme penalty. *North Carolina v. Alford,* 400 U.S. 25, 37, 91 S.Ct. 160, 167, 27 L.Ed.2d 162 (1970). There was no claim in *Alford,* however, that the prisoner had been selected for prosecution because of his race and had received ineffective assistance of counsel. No showing was made in *Alford* that the plea of guilty was constitutionally invalid on any ground. It should also be noted that the Supreme Court cautioned in *Alford* that its holding "does not mean that a trial judge must accept every constitutionally valid guilty plea merely because a defendant wishes so to plead." *Id.* at 38, 91 S.Ct. at 168.

Assuming the truth of Mr. Coleman's allegations, as we must in this appeal, it would have been improper for the State of Montana to have accepted Mr. Coleman's plea of guilty if he was selected for prosecution in violation of his federal constitutional rights. Furthermore, the evidence is undisputed that Mr. Coleman's offer to plead guilty followed an alteration of his memory by the state concerning his participation in the crimes charged against him as a result of an injection of sodium amytol. Long ago, in *Townsend v. Sain*, 372 U.S. 293, 83 S.Ct. 745, 9 L.Ed.2d 770 (1963), the Supreme Court observed that a confession of guilt that is drug induced would be involuntary. *Id.* at 307–09, 83 S.Ct. at 754–55. I seriously doubt that any of my colleagues would uphold a guilty plea obtained under such circumstances.

In footnote 9, the majority also states: "Until Coleman is resentenced, we cannot evaluate the merits of his claim of race discrimination based upon the State's refusal to plea bargain with him as it did Nank." The majority does not inform us why it cannot "evaluate" the merits of the claim of racial discrimination prior to resentencing. We have jurisdiction over this matter under section 2254. The federal constitutional claims are ripe for review. If these claims are valid, the majority has a duty to "evaluate" and invalidate the conviction now. There can be no valid sentence for a conviction based on invidious discrimination.

In the passage quoted in the preceding paragraph, the majority appears to suggest, albeit with delicate subtlety, that Mr. Coleman's claims of invidious selective prosecution, may possibly survive this appeal if this court is dissatisfied for unexplained reasons with the sentence imposed by the trial court for aggravated kidnapping or the treatment Montana gives to the *conviction* for that crime [1]. Does the majority mean by this puzzling comment that Mr. Coleman may return to the district court with a new petition for habeas corpus relief limited to the *sentence* "other than death" imposed by the Montana trial court upon remand for the crime of aggravated kidnapping? Or, instead, is the majority suggesting that Mr. Coleman may file an untimely petition for a rehearing in this court for a review of the judgment of *conviction* for aggravated kidnapping *limited to the claim of invidious discrimination,* if Montana's treatment of this conviction falls below the majority's undisclosed expectations? It should also be noted that because the remand is solely for resentencing for aggravated kidnapping, the State of Montana is under no duty, under the majority's mandate, to "treat" further the judgment of *conviction* for any of the crimes for which Mr. Coleman stands convicted.

I do not understand the majority's reluctance to face up to Mr. Coleman's constitutional attack on the judgment of *conviction* for aggravated kidnapping, deliberate homicide, and forcible rape in the appeal presently before this court. If Mr. Coleman has stated sufficient facts to show that these convictions were obtained in violation of his constitutional rights, he is entitled to an evidentiary hearing in the district court now. The treatment Montana may give the *sentence* for aggravated kidnapping upon remand has no bearing on the validity of Mr. Coleman's challenge to his *convictions* for aggravated kidnapping, deliberate homicide or forcible rape. Let us assume that upon remand Montana requests and is granted a dismissal of the aggravated kidnapping charge. In that event, has the majority concluded, by its concern over how Montana will "treat" the aggravated kidnapping charge, that Mr. Coleman should spend the rest of his life in prison on the remaining charges, without further federal review, notwithstanding the fact that he has alleged that he is the victim of invidious selective prosecution because he is black, that he received ineffective assistance of counsel at the guilt phase

---

1. The majority appears to have affirmed *sub silentio* the district court's dismissal of his claims that he was denied effective counsel and that he was convicted in clear violation of Montana law on the uncorroborated testimony of a mentally incompetent accomplice. The majority does not suggest that it will evaluate the merits of these claims after Mr. Coleman is resentenced.

of the trial, and that the evidence supporting his conviction is based on the testimony of an uncorroborated and mentally incompetent accomplice? Mr. Coleman has spent over thirteen years in custody. He is entitled to his freedom now if he can prove the truth of these allegations without regard to Montana's treatment of the aggravated kidnapping charge.

In footnote 9, the majority attempts to justify its failure to confront Mr. Coleman's serious constitutional challenges to his convictions with the curious comment that "[t]here is a strong practical possibility that today's decision upholding one of Coleman's principal constitutional arguments will serve ultimately to make it unnecessary for us to consider Coleman's remaining claims." Majority Opinion, page 1290 n. 9. Nothing in the record, the many briefs that have been filed in this matter, or the arguments of Mr. Coleman's counsel support the majority's speculation that he will abandon his claim that he is an innocent black man victimized by racial discrimination if the sentence imposed for aggravated kidnapping is reversed.[2]

The majority persists in ignoring the fact that if Mr. Coleman was the victim of invidious selective prosecution, his conviction for aggravated kidnapping is invalid. If so, any sentence, whether life or death, must also be set aside.

The majority has avoided deciding hard constitutional questions properly before it concerning the validity of the convictions and has purported to resolve a *sentencing* issue it has no jurisdiction to reach if selective *prosecution* on racial grounds has been demonstrated.

In 1981, Justice Morrison of the Montana Supreme Court made the following comment about this case:

The majority has one salutary aspect. It has finally freed Coleman from the yoke of the state court system and permits him to pursue his claims in federal court. A federal court cannot help but be more receptive to the important questions that Coleman has raised but this court has turned down by wholesale and summary disposition. I cannot conceive that this case will leave a federal court with the abiding conviction that justice was done.

*Coleman v. State,* 633 P.2d 624, 666 (1981) (Morrison, J., dissenting).

Unfortunately, Justice Morrison was wrong. This case will be returned to Montana by the federal court system without discussing or resolving Mr. Coleman's claim that his convictions must be set aside because of selective prosecution, ineffectiveness of counsel, and legal insufficiency of the evidence to convince a rational trier of fact of his guilt beyond a reasonable doubt.

I would not want the task of explaining to Mr. Coleman that his federal constitutional challenges to his *convictions* for aggravated kidnapping, deliberate homicide, and forcible rape will not be reached by this court because "[t]here is a strong practical possibility" that he will give up his claim that an innocent man was selected for prosecution because he is black in view of the fact that the majority reversed the *sentence* imposed for aggravated kidnapping. A prisoner who forcefully has proclaimed his innocence for over thirteen years, condemned to be imprisoned for the remainder of his life, might be forgiven if he suppresses his enthusiasm for the majority's imaginative interpretation of Mr. Coleman's undisclosed goals in this litigation.

## IV

The court's disposition of this appeal is also unfair to the State of Montana. The majority has reversed the sentence of death for the crime of aggravated kidnapping because, at the trial on the issue of guilt, Mr. Coleman's defense counsel introduced evidence that his client participated in an uncharged burglary. Instead of ordering that a new trial be conducted so that

---

**2.** If the majority's efforts at mind reading prove to be accurate, it may have discovered a calendar clearing procedure I will label "appellate sentence bargaining," in which a state prisoner is induced to abandon meritorious federal constitutional challenges to the guilt phase of the trial in exchange for a sentence "other than death."

Montana can attempt to prove, after an error-free trial, that the extreme penalty is warranted, the majority has reversed the sentence of death; ordered a punishment "other than death"; ruled against Mr. Coleman's challenge to the jury that *convicted* him; and implicitly affirmed the denial of an evidentiary hearing on his remaining constitutional claims that clearly "impact" on his *convictions* of each offense. Thus, with the same brushstroke, the majority has denied Mr. Coleman the opportunity to prove that he is entitled to his freedom from the threat of any further incarceration on the aggravated kidnapping charge, not merely a punishment "other than death," and interfered with Montana's right, under the police powers expressly reserved to the states by our federal constitution, to impose the death penalty for this offense.

The majority has not explained why it has denied to Montana the opportunity to seek the death penalty upon remand under circumstances free of constitutional error. In footnote 7, the majority expressly declines to reach the question whether a state prisoner who was sentenced under a constitutionally defective statute can receive a death sentence under a law enacted after his conviction. Nevertheless, without explanation or citation to the source of its authority, the majority has decreed that the State of Montana may not again impose the death penalty in this case.

If the majority has silently concluded that a state may not resentence a condemned person under a statute enacted after his or her conviction, I respectfully suggest that this important constitutional issue is deserving of thoughtful discussion and critical analysis. Instead, while the opinion carefully explains in footnote 7 that this issue will not be reached, the majority proceeds without explanation to enter an order that denies *ex post facto* effect to a death penalty statute. Proper respect for comity and "our federalism" demands that we act with appropriate restraint and sensitivity, and set forth a principled explanation, when we deny to a state the right to follow its own public policy in selecting the appropriate punishment that should be im-

posed for a violation of its criminal code. *See Rummel v. Estelle,* 445 U.S. 263, 274, 100 S.Ct. 1133, 1139, 63 L.Ed.2d 382 (1980) ("one could argue without fear of contradiction by any decision of this Court that for crimes concededly classified and classifiable as felonies, ... the length of the sentence actually imposed is purely a matter of legislative prerogative.") I regret that the majority has declined to offer any justification for its casual treatment of this grave constitutional question.

## CONCLUSION

Once again, Mr. Coleman has been denied a decision on the merits of his serious allegations of racial discrimination against the State of Montana in selecting him for prosecution of aggravated kidnapping, deliberate homicide, and forcible rape. After thirteen years in custody, Mr. Coleman has the right to be told *now* whether the majority believes that he is entitled to an evidentiary hearing to test the constitutional validity of the guilt phase of his trial.

The Supreme Court has instructed federal courts that colorable claims of constitutional error must be given careful scrutiny in a capital case. *Zant,* 462 U.S. at 885, 103 S.Ct. at 2747. Inexplicably, the majority has concluded that it has no duty whatsoever to scrutinize Mr. Coleman's claims of selective prosecution against an innocent black man, ineffectiveness of counsel at the guilt phase of the trial proceedings, and a denial of due process based on the legal insufficiency of the evidence to support his conviction.

The majority appears to have concluded that Mr. Coleman will be willing to abandon his claim that he was *convicted* of deliberate homicide and forcible rape in violation of several of his constitutional rights in view of its determination that Montana cannot exact the death penalty in this case. I have read the briefs and heard the oral argument in this matter. I can find no clue that Mr. Coleman's thirteen-year challenge to his *conviction* of each offense has been a clever tactical ploy and that his only goal has been to avoid the death penalty.

Because this is an en banc proceeding, further review of Mr. Coleman's claims be-

fore this court in this appeal is unlikely. If the majority has misjudged Mr. Coleman's intentions, he must now seek relief from the United States Supreme Court. If so, the Supreme Court undoubtedly will summarily remand this matter with directions that we exercise our appellate responsibility to decide whether Mr. Coleman has stated sufficient facts which, if true, require that the judgment of conviction be set aside because he is the victim of selective prosecution, he was ineffectively represented at the guilt phase of his trial and the evidence of his guilt is legally insufficient.

Montana may also elect to seek review of the majority's conclusion that it can vacate a sentence of death and bar its reimposition, without determining the constitutionality of Montana's capital punishment statute or offering an explanation of the source of its power to limit the state court's discretion.

The unprecedented procedure adopted by the majority for this appeal has denied Mr. Coleman his right under section 2254 to a review of his federal constitutional challenges to the guilt phase of his trial. The majority has also exceeded its limited jurisdiction by purporting to deny to Montana its right to select the appropriate punishment, consistent with the eighth amendment, for violation of its laws. Because I am persuaded that we cannot ignore any of the colorable constitutional challenges to Mr. Coleman's convictions presented in this appeal in the manner suggested by my colleagues, I respectfully decline to join in their number.

I would first determine whether each of the convictions should stand before discussing the validity of sentences imposed by the court. If each of the convictions must be reversed because of invidious selective prosecution, ineffectiveness of counsel, or the legal insufficiency of the evidence, the issue of punishment for any offense becomes moot, and a discussion thereof becomes advisory and beyond our limited jurisdiction.